739 S.E.2d 209

Christopher T. **LANDERS**, Respondent,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION** as Receiver for Atlantic Bank and Trust, Atlantic Banc Holdings, Inc., and Neal Arnold, Appellants.

No. 27223.

Supreme Court of South Carolina.

Heard March 20, 2012.

Decided Feb. 27, 2013.

C. Mitchell Brown and Sue E. Harper, both of Columbia, of Nelson Mullins Riley & Scarborough, LLP, and Amy L.

Gaffney of Columbia, of Gaffney Lewis and Edwards, LLC, for Appellants.

Clayton B. McCullough, of McCullough Khan, LLC, of Charleston, for Respondent.

Justice KITTREDGE.

This case concerns the scope of an arbitration clause under the Federal Arbitration Act (FAA). Respondent Christopher Landers served as Appellant Atlantic Bank & Trust's executive vice president pursuant to an employment contract. The contract contained a broad arbitration provision, requiring arbitration of "any controversy or claim arising out of or relating to this contract, or breach thereof." In the underlying action, in which Landers alleges five causes of action, Landers claims he was constructively terminated from his employment as a result of Appellant Neal Arnold's tortious conduct towards him. Appellants moved to compel arbitration pursuant to the employment contract. The trial court found that only Landers' breach of contract claim was subject to the arbitration provision, while his other four causes of action comprised of several tort and corporate claims were not within the scope of the arbitration clause. We disagree.

Landers' pleadings provide a clear nexus between his claims and the employment contract sufficient to establish a significant relationship to the employment agreement. We find the claims are within the scope of the agreement's broad arbitration provision. Thus, we reverse the trial court's order and hold that all of Landers' causes of action must be arbitrated.

## I.

In 2005, Landers and two other individuals founded Atlantic Bank & Trust (Bank).[1] Landers purchased 50,000 shares of

---

1. Bank is a federally-chartered savings bank with branches in South Carolina and Georgia. In June 2011, the Office of Thrift Supervision (OTS), a former federal agency under the United States Department of Treasury, took possession of the business and property of Bank and appointed the Federal Deposit Insurance Corporation (FDIC) as its receiver. In April 2012, the FDIC disallowed Landers' claim he submitted pursuant to 12 U.S.C. § 1821(d)(5) (2006). However, subsection (d)(6) permits a claimant, as a matter of right, to continue an action

common stock of Bank's holding company, Atlantic Banc Holdings, Inc. (Holding Company). On February 20, 2007, Landers and Bank entered into a written employment agreement (Agreement). The Agreement contained an arbitration provision which stated: "Except matters contemplated by Section 17 below [Applicable Law and Choice of Forum], *any controversy or claim arising out of relating to this contract, or the breach thereof,* shall be settled by binding arbitration . . . ." (emphasis added).

The Agreement provided for an initial term of three years' employment for Landers as Executive Vice President and Chief Mortgage Officer and automatic extensions for successive one-year terms unless either party gave written notice of an intent not to extend the contract. The Agreement also stated that after Holding Company established a stock incentive plan, Landers was to receive an option to purchase 65,000 shares of common stock of Holding Company and provided for a lump-sum payment of 2.99 times Landers' base pay in the event his employment was terminated within one year after a change of control.[2]

Pursuant to the Agreement, Landers was to perform his duties "subject to the direction of the [CEO]" and "diligently follow and implement all reasonable and lawful management policies and decisions communicated to him by the [CEO]." Landers was required to "devote substantially all of his time, energy and skill during regular business hours to the performance of the duties of his employment . . . and faithfully and industriously perform such duties." Finally, the Agreement expresses what constituted termination for "cause" and Landers was authorized to terminate the Agreement for cause based upon "a material diminution in the powers, responsibilities, duties or compensation of [Landers]" thereunder.

Bank, like most, suffered financial hardship as a result of the economic collapse in the fall of 2008. In May 2009, Bank's

commenced before the appointment of the receiver. Neither the FDIC nor Appellants oppose the action's continuation before this Court.

**2.** Under the Agreement, a reorganization that results in current stockholders of Bank or Holding Company immediately prior thereto owning less than fifty percent (50%) of the combined voting power constitutes a change of control.

Board of Directors (Board) hired Neal Arnold to serve as CEO and Landers voluntarily accepted the position of president.[3] Thereafter, Arnold began soliciting out-of-state investors to recapitalize Bank. Landers claims he was assured by Arnold that his job was safe despite the impending recapitalization. According to Landers, however, since Arnold's arrival, he was "systematically and deliberately stripped of his authority" as president. Landers contends Arnold began a campaign to "discredit, belittle, demean, and constructively terminate" him. Arnold and other executives stated "Landers had ADD [Attention Deficit Disorder] and was incompetent to perform his job" and "incapable of effectively communicating with anyone in performing his job."

Landers alleges that these and other statements were made in front of numerous coworkers. He also claims Arnold's behavior towards him was verbally abusive, demeaning, and generally unprofessional and improper. According to Landers, Arnold routinely called him offensive names and used unseemly language towards him in front of upper-level management and other co-workers. In one instance, Landers contends Arnold even threatened him in a highly aggressive and volatile manner when Landers came to the defense of a junior co-worker. Beginning in September 2009, Landers alleges he was forced to sign in and out whenever he left the office and was required by Arnold to enlist the help of other management personnel when communicating with a certain client because Arnold asserted he was not capable of handling these discussions.

Additionally, Landers contends Arnold steadily and purposefully provided incorrect information to him about the status of Bank's management. Landers claims he was not permitted to see documentation regarding the recapitalization or takeover despite repeatedly asking for such information. The pertinent documents revealed a new management team and Board, neither of which listed Landers as a member. Landers also asserts Arnold repeatedly assured him that he would be entitled to receive payment for the "Change in Control" pursuant to the Agreement, which Appellants now

3. Landers began serving as Bank's Chief Executive Officer (CEO) in October of 2008.

refuse. According to Landers, Appellants also refuse to offer him stock options to which he is entitled under the Agreement.

On December 18, 2009, Landers sent a letter to Arnold "recognizing his constructive termination." Landers expressed he was writing the letter "as a result of [Arnold's] actions over the past six months, especially those over the last 30 days." In the letter, Landers claims Arnold "acted to effectively destroy [his] authority and ability to perform [his] job." In one section, the letter states:

> You have made a concerted effort to undermine my authority, removed much of my authority, changed my duties, have defamed me in front of co-workers, and generally made it impossible for me to perform as President. You continue to withhold vital information and misrepresent facts. As a result, you have effectively terminated me from my position as President of Atlantic Bank.

Arnold accepted Landers' letter of constructive termination several days later.

In January of 2010, Bank and Holding Company sent a Notice of Special Meeting and Proxy to their shareholders. The Notice contained information regarding new investors and proposed amendments to the Articles of Incorporation. According to Landers, the Notice and Proxy Statement contained incomplete and misleading information concerning the effect the recapitalization would have on shareholders of common stock.[4] Landers alleges he was "forced out" of Bank as a result of the concerns that he expressed regarding Arnold's campaign to provide incorrect information about the recapitalization. In his complaint, Landers states: "As a result of Landers' concerns, and in an effort to eliminate Landers as a potential problem, he was stripped of much of his authority as President, defamed, and then terminated by Atlantic Bank."

Lastly, Landers contends he was excluded from his role as a director on the Board in "an ongoing effort to freeze [him] out

---

4. Landers contends the proposed transaction and amendments to the Articles of Incorporation would allow the takeover company, through appointed directors, to pay dividends on its preferred stock but not the common stock. It would also allow directors to take other actions detrimental to the common shareholders, including Landers, and force their share values to zero.

and strip him of his authority." According to Landers, when he was not permitted to call in to a special Board meeting in May 2010, he went to the meeting in person and was asked to recuse himself. Landers refused to recuse himself and claims he was ejected from the meeting. Landers alleges he is no longer provided necessary information or authority to serve in his capacity as a director.[5]

Landers commenced this action in January 2010. In his complaint, Landers' asserted five causes of action: (i) breach of contract/constructive termination; (ii) slander/slander per se; (iii) intentional infliction of emotional distress; (iv) illegal proxy solicitation pursuant to S.C. Code Ann. § 33–7–220(i) (Supp. 2011);[6] and (v) wrongful expulsion as a director. Appellants moved to compel arbitration pursuant to the arbitration clause contained in the Agreement and to dismiss or stay the action. The trial court ordered arbitration for Landers' breach of contract/constructive termination claim. However, the trial court denied Appellants' motion to compel arbitration as to the remaining causes of action. In doing so, the court found there was not a significant relationship between the claims and the Agreement. Alternatively, the court found the allegations underlying the claims were unforeseeable at the time the parties entered into the Agreement. Thus, the trial court stayed the breach of contract claim and ordered that the remaining four claims proceed to court.

## II.

"The question of arbitrability of a claim is an issue for judicial determination unless the parties provide other-

---

5. Appellants admit Landers was asked to recuse himself from the Board meeting due to the ongoing litigation and the potential conflict of interest. Appellants contend Landers tendered his resignation from the Board in June 2010.

6. The text of the statute reads:

A proxy may not be solicited on the basis of any proxy statement or other communication, written or oral, containing a statement which, at the time and in light of the circumstances under which it was made, was false or misleading with respect to a material fact or which omits to state a material fact necessary to make the statements made not false or misleading.

S.C.Code Ann. § 33–7–220(i).

wise." *Partain v. Upstate Automotive Group*, 386 S.C. 488, 491, 689 S.E.2d 602, 603 (2010). "The determination of whether a claim is subject to arbitration is subject to de novo review." *Id.* (citing *Gissel v. Hart*, 382 S.C. 235, 240, 676 S.E.2d 320, 323) (2009). However, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 596, 553 S.E.2d 110, 118 (2001).

### III.

Generally, any arbitration agreement affecting interstate commerce, such as the one at issue, is subject to the FAA. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (holding that in the employment context, only transportation workers' employment contracts are exempted from the FAA's coverage); *see also* 9 U.S.C. §§ 1, 2. Once it is determined that the FAA applies to a dispute, federal substantive law regarding arbitrability controls. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute. The court is to make this determination by applying the federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the [FAA].").

Whether a party has agreed to arbitrate an issue is a matter of contract interpretation and "[a] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir.1996) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary state-law principles that govern the formation of contracts."). Although the intention of parties is relevant, as a matter of

policy, arbitration agreements are liberally construed in favor of arbitrability. *Am. Recovery,* 96 F.3d at 94.

■ It is the policy of this state and federal law to favor arbitration and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 92 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *accord Zabinski,* 346 S.C. at 598, 553 S.E.2d at 118. " 'The heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.' " *Am. Recovery,* 96 F.3d at 94 (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.,* 867 F.2d 809, 812 (4th Cir.1989)). Such a presumption is strengthened when an arbitration clause is broadly written. *AT & T Tech., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Therefore, " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[,]' " arbitration must generally be ordered. *Am. Recovery, 96 F.3d at 92* (quoting *Warrior & Gulf Navigation Co.,* 363 U.S. at 582–83, 80 S.Ct. 1347); *Zabinski,* 346 S.C. at 597, 553 S.E.2d at 119.

■ A clause which provides for arbitration of all disputes "arising out of or relating to" the contract is construed broadly. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 398, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (labeling as "broad" a clause that required arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement"). Courts have held that such broad clauses are "capable of an expansive reach." *Am. Recovery Corp.,* 96 F.3d at 93. Both the Fourth Circuit Court of Appeals and this Court have held that the sweeping language of broad arbitration clauses applies to disputes in which a significant relationship exists between the asserted claims and the contract in which the arbitration clause is contained. *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 319 (4th Cir.1988); *Zabinski,* 346 S.C. at 598, 553 S.E.2d at 119. Thus, the scope of the clause does "not limit arbitration to the literal interpretation or performance of the contract [, but] embraces every dispute between the parties having a significant rela-

tionship to the contract." *J.J. Ryan*, 863 F.2d at 321. In applying this standard, this Court "must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim." *Id.* at 319; *Zabinski*, 346 S.C. at 597, 553 S.E.2d at 118.

It is within this framework that we must determine whether Landers' claims are within the scope of the Agreement's arbitration clause.

## A.

Landers contends that the tort claims of slander and intentional infliction of emotional distress are not within the scope of the arbitration clause.[7] Specifically, Landers asserts they are not subject to arbitration because they do not require reference to or construction of the Agreement. We disagree and find Landers' tort claims bear a significant relationship to the Agreement, such that they must be arbitrated.

In support of his contention, Landers suggests the situation before us is indistinguishable from *McMahon v. RMS Electronics, Inc.*, 618 F.Supp. 189 (S.D.N.Y.1985). In that case, after McMahon's employment was terminated by RMS, he brought a lawsuit alleging eight causes of action, including three defamation claims. McMahon alleged that one week before his termination, the president of RMS stated to another employee that McMahon was the "company drunk" and was "interfering with the president's operation of the company." The New York district court denied RMS's motion to compel arbitration as to this defamation claim. The court stated "although the statements regarding McMahon's drinking habits may be relevant to his claim of wrongful termination, the resolution of the defamation claim does not require reference to the underlying contract" and "does not require an interpretation of the contractual agreement between the two parties." *Id.* at 193. The court further stated "the defamation claim is

---

7. Because Landers expressly states in his complaint that the slanderous statements were encompassed in his claim of intentional infliction of emotional distress, we find it appropriate to analyze the related claims together.

not arbitrable simply because the statements were made during the term of McMahon's employment." *Id.*

We find *McMahon* unpersuasive. Certainly, arbitration is only required where the parties have contracted for it, and "the exact content of the allegedly defamatory statement must be closely examined to see whether it extends to matters beyond the parties' contractual relationship." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20 (2d Cir.1995); *see also Brown v. Coleman Co.*, 220 F.3d 1180, 1184 (10th Cir.2000) (finding that a defamatory explanation which dealt with the termination of plaintiff's employment and his supposed violation of his employment contract was within the scope of a broad arbitration clause). However, under the expansive reach of the FAA a tort claim need not raise an issue that requires reference to or the construction of some portion of the contract in order to be encompassed by a broadly-worded arbitration clause. *See J.J. Ryan*, 863 F.2d at 321 (finding that under the significant relationship test, broad arbitration clause does not limit arbitration to literal interpretation or performance of the contract).

Moreover, the allegedly defamatory statements made in *McMahon* related to the employee's general character, whereas here, Landers asserts that the alleged tortious conduct and defamatory statements of Arnold directly related to Landers' ability to perform his duties with Bank. *Cf. Fleck v. E.F. Hutton Group, Inc.*, 891 F.2d 1047 (2d Cir.1989) (statements that broker had lost his license and was "basically a criminal" were relevant to job performance and within the scope of arbitration clause arising out of employment or termination of employment, but not statement that broker was disbarred by lawyer). Landers alleges outrageous statements and conduct that "generally made it impossible for [him] to perform as President." He asserts the alleged tortious conduct of Arnold "discredit[ed], belittle[d], demean[ed], and constructively terminate[d]" him. Furthermore, he claims the statements were intended to create an impression he was "incapable of performing his job effectively."

We find Landers' tort claims bear a significant relationship to the Agreement. The Agreement contains not only monetary rights and obligations, but also articulates the duties and

obligations of Landers and provides that Landers is subject to the direction of the employer, requiring him to diligently follow and implement all policies and decisions of the employer. Furthermore, the Agreement contemplates what constitutes cause for termination, including a "material diminution in [ ] powers, responsibilities, duties or compensation."

Thus, in light of the breadth of the Agreement and the particular manner in which Landers has pled his underlying factual allegations, we find Landers' tort claims significantly relate to the Agreement. The perceived inability to perform one's *job* certainly relates to an *employment* contract.[8] Even assuming the arbitrability of the claims was in doubt, which it is not, we cannot say with positive assurance that the arbitration clause is not susceptible of an interpretation that Landers' slander and intentional infliction of emotional distress claims are covered by the clause. Thus, we reverse the trial court's order denying Appellants' motion to compel the causes of action of slander and intentional infliction of emotional distress.

## B.

Landers also contends that his corporate claims of illegal proxy solicitation and wrongful expulsion as director are not within the scope of the arbitration provision. Certainly, the question of whether Landers' corporate claims are within the

---

8. *See Gillespie v. Colonial Life & Accident Ins. Co.*, No. 08–689, 2009 WL 890579 (W.D.Pa. March 30, 2009) (finding broad arbitration clause applied to claims of sexual harassment and retaliation because the claims related to employee's business relationship with Colonial, not merely disputes relating to specific provisions of the contract in accordance with South Carolina law); *Smith v. Cato*, No. 3:05CV99, 2006 WL 1285521 (W.D.N.C. May 9, 2006) (finding plaintiff's defamation claim, which was based on allegations of employee's gross negligence and misconduct as the grounds for termination, bore a significant relationship to the employment agreement); *Orcutt v. Kettering Radiologists, Inc.*, 199 F.Supp.2d 746 (S.D.Ohio 2002) (finding claims based on discrimination, harassment, and retaliation that occurred during the course of employment clearly arose out of or related to plaintiff's employment agreement); *Stanton v. Prudential Ins., Co.*, No. 98–4989, 1999 WL 236603 (E.D.Pa. April 20, 1999) (noting that tort claim of intentional infliction of emotional distress was arbitrable since it arose directly from the circumstances leading to plaintiff's termination from employment).

scope of the arbitration clause is admittedly closer than his tort claims discussed above. However, we find untenable Landers' assertion that these corporate claims do not bear a significant relationship to the terms and conditions of his employment contract or any breach thereof. In any event, we cannot say with positive assurance that such claims are not within the scope of the arbitration clause within the Agreement. Thus, we hold these claims are also subject to arbitration.

*Illegal Proxy Solicitation*

■ The essence of Landers' illegal proxy solicitation claim is that the proxy statement issued by Bank was materially misleading as to the effect the recapitalization could have on the common shareholders, including Landers.

Although Landers' status as a shareholder did not originally derive from the Agreement,[9] the Agreement does in fact contemplate his status as a shareholder. By Landers' own allegation, Appellants were required to grant him an option to purchase 65,000 additional shares of common stock pursuant to the Agreement.[10]

Furthermore, the Agreement's arbitration clause mandates arbitration of "any controversy or claim arising out of relating to this contract, or the *breach thereof.*" (emphasis added). Landers' allegations provide a direct link between his status as a shareholder and the purported breach of the Agreement. Specifically, Landers claims that "because [he] stated his concerns and sought complete, accurate information regarding the transactions [including recapitalization and amendments to the Articles of Incorporation] and its potentially adverse effects, *he was forced out of Atlantic Bank* causing him further injury." Landers further states, *"But for* the proxy solicitation and other misleading information, [he] would not have questioned the material omissions leading to his termination." (emphasis added).

---

9. According to the Record, Landers purchased 50,000 shares of stock when he founded Bank, not pursuant to any provision in the Agreement.

10. Landers alleges Appellants have refused to grant him such option.

*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72 (2d Cir. 1998) is instructive here. In *Oldroyd*, the plaintiff, a former vice president of a bank, alleged he was wrongfully discharged because he informed the United States Treasury Department of illegal loan activity occurring at the bank. In finding the plaintiff's retaliatory discharge subject to arbitration, the Second Circuit Court of Appeals stated:

> In alleging retaliatory discharge, Oldroyd asserts that he was unlawfully terminated by his employer because he informed [the Treasury Department] of the illegal loan activity occurring at ESB. Inasmuch as more than half of Oldroyd's employment contract relates to the subject of termination from employment, there can be no doubt that a retaliatory discharge claim touches matters covered by the employment contract. For example, the contract addresses such matters as what constitutes "cause" for termination, benefits to be provided after termination, notice requirements for termination, termination upon change of control, and related matters. Accordingly, we conclude that since Oldroyd alleges that he was terminated under circumstances giving rise to a retaliatory discharge claim, such claim touched matters covered by the employment agreement and therefore is clearly within the scope of the agreement's arbitration clause.

134 F.3d at 77.

Similarly here, Landers' pleadings link the alleged illegal proxy solicitation to his wrongful termination and the resulting breach of the Agreement. Thus, we conclude his illegal proxy solicitation claim is significantly related to the Agreement. Moreover, this Court cannot say with positive assurance that the proxy cause of action is not within the scope of the arbitration clause. Because any doubt must be resolved in favor of arbitration, we reverse the trial court and find Landers' illegal proxy solicitation claim must be arbitrated.

*Wrongful Expulsion as Director*

 With regard to his wrongful expulsion claim, Landers asserts that he was "frozen out" of and improperly excluded from his role as a member of the Board since filing the initial summons and complaint on January 21, 2010. He contends his position has materially changed, such that he has suffered

a reduction in duties and authorities in his capacity as director.

Landers' pleadings do not inform the Court how he came to be a director and nothing in the Agreement contemplates Landers' position as a director. Thus, we are compelled to conclude that his status as a director does not derive from the Agreement. Nonetheless, Landers asserts that he was wrongfully expelled because he filed suit for breach of the Agreement. As we previously referenced, the Agreement mandates arbitration of any claim arising out of or relating to the breach of the Agreement. By Landers' own contention, the breach of the Agreement resulted in his expulsion as a director. Similar to Landers' proxy solicitation claim, we find the wrongful expulsion claim bears a significant relationship to the Agreement or breach thereof. See *Oldroyd*, 134 F.3d at 77 (finding that because plaintiff alleged he was terminated under circumstances that gave rise to a retaliatory discharge claim, the claim touched matters covered by the employment contract and thus was within the scope of the contract's arbitration clause). Thus, we reverse the trial court's order denying Appellants' motion to compel arbitration of the wrongful expulsion as director claim.

We stress that our decision today is driven by the strong policy favoring arbitration, the nature of the Agreement, and Landers' underlying factual allegations. Certainly, we recognize that even the broadest of clauses have their limitations. However, Landers has essentially pled himself into a corner with respect to each of his claims. Indeed, he has provided a clear nexus between the underlying factual allegations of each of his claims and his inability to perform the employment Agreement and the alleged breach thereof, such that all of his causes of action bear a significant relationship to the Agreement. Thus, we reverse the trial court with respect to Landers' remaining four causes of action and hold that each is to be arbitrated.[11] In doing so, we also reject the trial court's

---

11. We find it unnecessary to address Appellants' remaining argument regarding the propriety of the potential stay of any non-arbitrable claims. See *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 518 S.E.2d 591 (1999) (appellate court need not address remaining issues when disposition of prior issue is dispositive).

alternative ruling that the claims are not subject to arbitration because they were not foreseeable.

## C.

We take this occasion to revisit federal jurisprudence regarding the analytical framework to determine whether a broad arbitration clause encompasses certain claims. In the last several decades, two terms—supposedly synonymous—have emerged as leading phraseologies in the analysis. Some jurisdictions, including this Court and the Fourth Circuit, utilize the "significant relationship" term, which we have employed today. Others have preferred the "touch matters" phrase, holding that broad arbitration clauses encompass all claims that "touch matters" covered by the contract or agreement. *See, e.g., 3M Co. v. Amtex Sec., Inc.,* 542 F.3d 1193, 1199 (8th Cir.2008) (noting the liberal federal policy favoring arbitration requires that a court send a claim to arbitration "when presented with a broad arbitration clause . . . as long as the underlying factual allegations simply 'touch matters covered by' the arbitration provision"); *Brayman Constr. Corp. v. Home Ins. Co.,* 319 F.3d 622, 626 (3d Cir.2003) ("[I]f the allegations underlying the claims 'touch matters' covered by an arbitration clause in a contract, then those claims must be arbitrated, whatever the legal labels attached to them.").

In theory, the two terms are interchangeable. *See Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716 (9th Cir.1999) (broad clause reaches every dispute having a significant relationship to the contract and all disputes having their genesis in the contract and the allegations only need "touch matters" covered by the contract); *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.,* 139 F.3d 1061 (5th Cir.1998) (discussing that broad arbitration clauses embrace all disputes between the parties having a significant relationship to the contract and holding it is only necessary that the dispute touch matters covered by the agreement to be arbitrable).

Yet, over time and in the context of certain cases, it appears a tension has developed regarding interpretations of the two terms. The phrase "significant relationship" has arguably evolved to impose an enhanced burden on the party seeking to compel arbitration. Conversely, "touch matters" has been in-

creasingly construed as requiring a lesser showing on the party desiring arbitration. This tension surrounding the tests for arbitrability and the policy favoring arbitration has been candidly acknowledged by the Fourth Circuit Court of Appeals. "We recognize that requiring a *significant* relationship in order to compel arbitration ... appears to be at odds with the language of the [ ] arbitration clause, which only requires that the [ ] claims *"relate to "* the [agreement]. We recognize as well that to require such a significant relationship may appear to be in tension with the Supreme Court's mandate that we apply the ordinary tools of contract interpretation in construing an arbitration agreement, and resolve any ambiguities in favor of arbitration." *Wachovia Bank Nat'l Assoc. v. Schmidt,* 445 F.3d 762, 767 n. 5 (4th Cir.2006) (emphasis in original).

We believe that these terms—"significant relationship" and "touch matters"—were never intended to be separate and independent tests for analyzing the scope of a broad arbitration clause. We employ the "significant relationship" term today only because it is in keeping with our jurisprudence. We merely observe that the two terms were not intended to differ in any meaningful way. Nonetheless, we note that if ever there did appear to be an appreciable conflict between the two phraseologies in the future, given the text of the FAA, the United States Supreme Court's interpretation of such, and the strong policy favoring arbitration, we would necessarily find that the "touch matters" term hues more closely to Congressional intent concerning the FAA.

## IV.

In conclusion, we reverse the trial court with respect to each of Landers' remaining four causes of action and hold that each is subject to arbitration.

*REVERSED.*

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.