**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Mary Beth Marzulli, Respondent,

v.

Tenet South Carolina, Inc., Hilton Head Health System, LP d/b/a Hilton Head Regional Medical Center, and Tenet Physician Services-Hilton Head, Inc., Appellants.

Appellate Case No. 2015-002363

———————

Appeal From Beaufort County
Marvin H. Dukes, III, Special Circuit Court Judge

———————

Unpublished Opinion No. 2018-UP-132
Heard November 9, 2017 – Filed March 28, 2018

———————

**REVERSED**

———————

Sue Erwin Harper and Allen Mattison Bogan, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia, for Appellants.

Stephen F. DeAntonio, of DeAntonio Law Firm, LLC, of Charleston, and Benjamin Thomas Shelton, of Finger, Melnick & Brooks, P.A., of Hilton Head Island, for Respondent.

———————

**PER CURIAM:** Tenet South Carolina, Inc., Tenet Physician Services-Hilton Head, Inc., and Hilton Head Health System, LP d/b/a Hilton Head Regional Medical Center (Hospital) appeal denial of their motion to compel arbitration of Respondent Mary Beth Marzulli's defamation claim. We reverse, finding the parties' arbitration agreement enforceable.

## I.

In 2011, Marzulli relocated from Pennsylvania to South Carolina to work as a physical therapist at Hospital. About a month after Marzulli started working, she attended an employee orientation, during which she signed an Agreement containing the following provision:

> I hereby voluntarily agree to use [Hospital's] Fair Treatment Process and to submit to final and binding arbitration of any and all claims and disputes that are related in any way to my employment or the termination of my employment with [Hospital]. I understand that final and binding arbitration will be the sole and exclusive remedy of any such claim or dispute against [Hospital] . . . and that by agreeing to the use of arbitration to resolve my dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the Fair Treatment Process. I also agree that such arbitration will be conducted before an experienced arbitrator chosen by me and [Hospital], and will be conducted under the [FAA] and the procedural rules of the American Arbitration Association ("AAA").
>
> I further acknowledge that in exchange for my agreement to arbitrate, [Hospital] also agrees to submit all claims and disputes it may have with me to final and binding arbitration . . . .

In May 2014, after receiving a complaint from the father of a minor female patient that Marzulli had inappropriately touched his daughter during a physical therapy session, Hospital reported the allegations to the Beaufort County Sheriff's Department (BCSD), as they believed S.C. Code §§ 63-7-310(A)-(B) (Supp. 2017) required them to do. Marzulli was suspended pending investigation by the Hospital and BCSD.

BCSD dismissed the patient's complaint as unfounded due to lack of evidence. After closing its investigation, Hospital notified Marzulli she would be reinstated, but presented her a Performance Improvement Plan (Plan) to address certain record-keeping deficiencies. Marzulli refused to accept the Plan and resigned.

Marzulli then sued Hospital for defamation, alleging its report to BCSD was defamatory and Hospital had repeated the defamation to others. Marzulli also claimed Hospital defamed her by having an administrator escort her, in front of other people, when she came to Hospital to collect her belongings and when she was refused access to another Hospital facility to retrieve personal items.

The circuit court denied Hospital's motion to compel arbitration, finding the Federal Arbitration Act (FAA) did not apply because the Agreement did not involve interstate commerce, was unconscionable, and Marzulli's defamation claims were not subject to the Agreement.

## II.

Due to the strong South Carolina and federal policy favoring arbitration, arbitration agreements are presumed valid. *See Cape Romain Contractors, Inc. v. Wando E., LLC*, 405 S.C. 115, 125, 747 S.E.2d 461, 466 (2013). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). We review circuit court determinations of arbitrability de novo, *Gissel v. Hart*, 382 S.C. 235, 240, 676 S.E.2d 320, 323 (2009), but will not reverse a circuit court's factual findings reasonably supported by the evidence.

Pursuant to the FAA,

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C.A. § 2 (West 2009). The FAA applies "to any arbitration agreement regarding a transaction that in fact involves interstate commerce, regardless of whether or not the parties contemplated an interstate transaction." *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001). This is sometimes called the "commerce in fact" test. In deciding whether a transaction involves "commerce in fact" sufficient to trigger the FAA, we examine the agreement, the

complaint, and the surrounding facts. *Towles v. United HealthCare Corp.*, 338 S.C. 29, 36, 524 S.E.2d 839, 843 (Ct. App. 1999).

Relying on *Flexon v. PHC-Jasper, Inc.*, 399 S.C. 83, 731 S.E.2d 1 (Ct. App. 2012), the circuit court found the Agreement did not involve interstate commerce because Marzulli was a South Carolina resident providing services to local residents at a local facility. We find this approach too narrow and contrary to more recent decisions. *Flexon* was decided before *Cape Romain* and *Dean v. Heritage Healthcare of Ridgeway, LLC*, 408 S.C. 371, 759 S.E.2d 727 (2014), which contain the controlling approach.

The phrase "involving commerce" as used in the FAA is "the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003). The Commerce Clause grants Congress the power to regulate (1) the use of channels of interstate commerce, (2) instrumentalities of interstate commerce, or persons or things in interstate commerce, and (3) activities having a substantial relation to interstate commerce. *United States v. Morrison*, 529 U.S. 598, 609 (2000). We are concerned here with the third category.

Under the FAA, "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control.'" *Citizens Bank,* 539 U.S. at 56–57 (citation omitted). Our supreme court has found a trial court erred by "analyzing the interstate commerce question solely as whether the Contract on its face reflected a 'substantial relation to interstate commerce.'" *Cape Romain*, 405 S.C. at 122–23, 747 S.E.2d at 464–65.

The proper inquiry is whether the economic activity at issue, in the aggregate, is a general practice subject to federal control. *Citizens Bank*, 539 U.S. at 57–58; *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) ("Congress's power, moreover, is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others.").

Our supreme court has recognized that "healthcare in general is an activity subject to federal control under the Commerce Clause and thus involves interstate commerce." *Dean,* 408 S.C. at 381 n.7, 759 S.E.2d at 732 n.7. *See also Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329 (1991) (discussing interstate commerce in context of Sherman Act; "Summit, the parent of Midway as well as of several other

general hospitals, is unquestionably engaged in interstate commerce. Moreover, although Midway's primary activity is the provision of health care services in a local market, it also engages in interstate commerce."); *Ping v. Beverly Enters., Inc.*, 376 S.W.3d 581, 589 (Ky. 2012) (finding the FAA applied because healthcare, in the aggregate, is an economic activity involving interstate commerce (citing *Summit*); *Miller v. Cotter*, 863 N.E.2d 537, 544 (Mass. 2007) (same).

The circuit court erred by focusing on the face of the Agreement and Marzulli's treatment of local patients. There was abundant evidence the economic activity in question involved interstate commerce. For example, Hospital accepts Medicare and Medicaid, and Father paid for Marzulli's services using Medicaid. *See Summit*, 500 U.S. at 327 ("The provision of ophthalmological services affects interstate commerce because both physicians and hospitals serve nonresident patients and receive reimbursement through Medicare payments."). Also, Marzulli treated patients using equipment primarily manufactured and shipped from outside South Carolina. *See Dean*, 408 S.C. at 381, 759 S.E.2d at 732 (FAA applied to a nursing home residency agreement in part because the meals and medical supplies provided by appellants were "shipped across state lines from out-of-state vendors"); *Episcopal Hous. Corp. v. Fed. Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977) (FAA applied to construction contracts in part because materials from outside the state would be used in project).

Because the economic activity at issue here—Marzulli's physical therapy practice at Hospital—represents the general practice of healthcare, we find Marzulli's employment involved interstate commerce.

## III.

Hospital next challenges the circuit court's finding of unconscionability. A court may invalidate an arbitration clause based on defenses applicable to contracts generally, including unconscionability. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017). To prove the arbitration provision unconscionable, Marzulli had to show both (1) she lacked a meaningful choice as to whether to arbitrate because the Agreement's provisions were one-sided, and (2) the terms were so oppressive no reasonable person would make them and no fair and honest person would accept them. *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668 (2007). While we analyze both prongs, they invite similar proof and often overlap.

Determining whether Marzulli meaningfully chose to arbitrate involves inquiry into "the fundamental fairness of the bargaining process." *Smith v. D.R. Horton, Inc.*, 417 S.C. 42, 49, 790 S.E.2d 1, 4 (2016). Accordingly,

> courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause.

*Simpson*, 373 S.C. at 25, 644 S.E.2d at 669.  We also consider whether the parties were represented by independent counsel.  *Smith*, 417 S.C. at 49, 790 S.E.2d at 4.

Here, Marzulli claimed injuries to her reputation and personal injury damages. Although this was not a standard form contract presented to an unsophisticated consumer, the parties' bargaining positions were still unequal given Hospital is a national corporation.  The circuit court found the Agreement was sprung upon Marzulli, leaving her with no meaningful choice but to sign it or quit her job.

We are not convinced the bargaining process was fundamentally unfair.  Employees of large corporations almost always wield weaker bargaining tools than their employer, but that alone cannot prove unconscionability.  Marzulli is a graduate of the University of Alabama, has done graduate work, and completed other advanced studies.  She has practiced physical therapy for more than four decades in cities such as Birmingham, Philadelphia, and Fort Lauderdale.  There is no evidence she was pressured or coerced into signing the Agreement or forbidden from negotiating for different terms.  While Marzulli was not represented by counsel, nothing stopped her from seeking independent legal advice or requesting further time to review the Agreement.

Marzulli's affidavit states she was told she had to sign the Agreement to access the employee handbook, and "based on this assertion," she signed it, but "did not read the document carefully and nothing on the face of the document stood out to me as having any significance whatsoever."  An educated professional's choice not to read an employment document is a far different thing from lack of a meaningful choice to accept the arbitration the document described.  As our supreme court has directed,

> [c]ourts should not refuse to enforce a contract on grounds of unconscionability, even when the substance of the terms

> appear grossly unreasonable, unless the circumstances surrounding its formation present such an extreme inequality of bargaining power, together with factors such as lack of basic reading ability and the drafter's evident intent to obscure the term, that the party against whom enforcement is sought cannot be said to have consented to the contract.

*Gladden v. Boykin*, 402 S.C. 140, 145, 739 S.E.2d 882, 884–85 (2013).

We disagree with the circuit court's conclusion the arbitration clause was inconspicuous. The clause was of the same size and font as the rest of the Agreement, which was only one page long. And the arbitration language took up about half of it. *See Munoz*, 343 S.C. at 541, 542 S.E.2d at 365 ("[A] person who can read is bound to read an agreement before signing it."). This seems benign compared to arbitration clauses that are often buried in fine print or tacked on to the end of seemingly endless commercial contracts. *Compare Simpson*, 373 S.C. at 27–28, 644 S.E.2d at 670 (finding an arbitration clause "written in the standard small print, and embedded in paragraph ten (10) of sixteen total paragraphs included on the page" inconspicuous when phrases within other provisions were printed in all capital letters and the arbitration clause contracted away statutory remedies).

We also disagree with the circuit court that the Agreement lacked consideration. Marzulli signed the Agreement about a month after she started work, and we have held continued employment sufficient consideration to support arbitration agreements. *Towles*, 338 S.C. at 40 n.4, 524 S.E.2d at 845 n.4.

As to the second unconscionability prong, the circuit court erred in finding the Agreement oppressive and one-sided. The Agreement is geared towards unbiased resolution of the parties' dispute by a neutral decision-maker, the most important consideration in deciding whether unconscionability exists. *See Simpson*, 373 S.C. at 25, 644 S.E.2d at 668. It requires an experienced arbitrator acceptable to both parties. It did not force Marzulli to forego any civil remedies (other than the right to a jury trial) or otherwise limit Hospital's civil liability.

The circuit court was troubled by the notion Hospital reported Father's complaint to law enforcement, thereby subjecting Marzulli to potential criminal prosecution before a jury, yet the Agreement forbids her from seeking a jury trial on her claim the Hospital's very reporting was defamatory. The circuit court also believed that because slander and libel can be criminal acts, S.C. Code Ann. § 16-7-150 (2015), they are unarbitrable. *But see Fitts v. Kolb,* 779 F. Supp. 1502, 1513–19 (D.S.C.

1991) (finding § 16-7-150 unconstitutionally vague and overbroad). This is an illusory dilemma. Nothing in the Agreement keeps (or could keep) either party from reporting suspected criminal activity to law enforcement, which could result in a prosecution tried by a jury. We take a practical view, and hold neither Hospital's statutory reporting nor the hypothetical possibility of a criminal analogue to a civil claim renders the parties' agreement to arbitrate unconscionable or otherwise unenforceable.

The parties shared a mutuality of civil remedies. While the validity of an arbitration agreement is not dependent on both parties agreeing to arbitrate all their claims against each other, here, both parties did. *See Simpson*, 373 S.C. at 31, 644 S.E.2d at 672. It is difficult to deem a contract term one-sided when it applies equally to both sides.

Finally, and importantly, the Agreement stipulated any arbitration was to be administered by the American Arbitration Association, a well-respected, neutral forum. Therefore, we hold the Agreement was not unconscionable.

## IV.

We last address Appellants' contention the circuit court erred in finding Marzulli's defamation claim was not contemplated by the Agreement. The arbitration clause here was broad, as Marzulli agreed to arbitrate "any and all claims and disputes that are related in any way" to her employment. *See Landers v. Fed. Deposit Ins. Corp.*, 402 S.C. 100, 109, 739 S.E.2d 209, 213 (2013) (arbitration clauses using words "arising out of or relating to" are construed broadly). Generally, "broadly-worded arbitration agreements apply to disputes in which a 'significant relationship' exists between the asserted claims and the contract in which the arbitration clause is contained." *Gissel*, 382 S.C. at 241, 676 S.E.2d at 323.

The circuit court found Marzulli's defamation action claim was not related to her employment because it was not a typical employment claim and the alleged defamation extended beyond the workplace.

Defamation claims can be significantly related to a party's employment and therefore arbitrable. *See Landers*, 402 S.C. at 111, 739 S.E.2d at 214–15 (finding Landers' defamation claim arbitrable because the alleged defamatory statements "directly related to Landers' ability to perform his duties with Bank"); *Pearson v. Hilton Head Hosp.*, 400 S.C. 281, 297, 733 S.E.2d 597, 605 (Ct. App. 2012) (finding Pearson's tort claims, including defamation, arbitrable because the arbitration clause was broad and Pearson's tort claims resulted from his employment); *Towles*, 338 S.C. at 42,

524 S.E.2d at 846 (finding Towles' defamation claim arbitrable because the agreement's plain language covered all tort and contract theories). In none of those cases have we required the defamatory statements be uttered within the walls of the workplace.

We are mindful that "arbitration is only required where the parties have contracted for it, and '[t]he exact content of the allegedly defamatory statement must be closely examined to see whether it extends to matters beyond the parties' contractual relationship.'" *Landers*, 402 S.C. at 111, 739 S.E.2d at 214 (citation omitted). "However, under the expansive reach of the FAA a tort claim need not raise an issue that requires reference to or the construction of some portion of the contract in order to be encompassed by a broadly-worded arbitration clause." *Id.*

Marzulli's defamation claim was significantly related to her employment as it involves an allegation Marzulli inappropriately touched a patient while working at Hospital. Further proof Marzulli's claim is interwoven with her employment can be found in her own complaint, where she alleges Hosptial's actions were defamatory *per se*, as they suggest she is unfit for her profession. Even if there were doubts Marzulli's claim was covered by the Agreement, we must resolve them in favor of arbitration, and "unless the [c]ourt can say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute, arbitration should be ordered." *Carolina Care Plan, Inc.*, 361 S.C. at 550, 606 S.E.2d at 755. Because the alleged defamation concerned Marzulli's workplace conduct and the arbitration clause has expansive breadth, we find Marzulli's claims arbitrable.

Therefore, the circuit court's denial of Appellants' motion to compel arbitration is

**REVERSED.**

**LOCKEMY, C.J., HUFF and HILL, JJ., concur.**