682 S.E.2d 523

**William A. HARRIS, Appellant,**

v.

**IDEAL SOLUTIONS, INC., Carolina Pay, Inc., Steven A. Ivester, and Michael Surprenant, Respondents.**

No. 4603.

Court of Appeals of South Carolina.

Submitted June 1, 2009.
Decided Aug. 5, 2009.
Rehearing Denied Sept. 17, 2009.

George E. Lafaye, IV, of Greenville, for Appellant.

O.W. Bannister, of Greenville, for Respondents.

SHORT, J.:

William Harris appeals from the master-in-equity's final order of dissolution of a partnership, arguing the master erred in: (1) finding the separation agreements were ambiguous; and (2) if the agreements were ambiguous, interpreting them to include the health insurance claims and attorneys' fees as liabilities of all three parties because they were not specifically included in the parties' agreement. We affirm.

## FACTS

In December 1997, Harris, Steven Ivester, and Michael Surprenant incorporated Ideal Solutions, Inc. and Carolina Pay, Inc.[1] Ideal Solutions provided its customers with employees and services, including health insurance and workers'

---

1. Although the business was incorporated, the parties ran it as a partnership.

compensation insurance. Carolina Pay provided only payroll services to its customers. Ideal Solutions used a broker to acquire health insurance for its customers; however, it was discovered in December 2001 that the insurance company chosen by the broker was fraudulent. By the time Ideal Solutions learned of the sham, claims of covered employees had not been paid. Ideal Solutions also had similar problems with its workers' compensation insurance. The unpaid employee claims from the thirteen-month period when Ideal Solutions did not have health insurance coverage were potential liabilities of Ideal Solutions and its three partners. Ideal Solutions hired attorneys to sue the responsible parties and to defend it against claims from employees for unpaid health insurance claims.

In February 2004, the parties discussed ending their business relationship and signed a separation agreement on March 30, 2004. The March 30, 2004 agreement divided the assets of Ideal Solutions into thirds, including its customer lists. After the division of the assets and liabilities, Ivester and Surprenant decided to remain partners. All three partners agreed Harris was to receive $8,476 less than their assets for leaving the partnership. Following the agreement, the parties continued to negotiate and signed a new agreement on April 30, 2004.[2] After the April 30, 2004 agreement was signed, additional health care and workers' compensation claims were filed against Ideal Solutions. All of the claims arose from the

---

2. The April 30, 2004 agreement stated: "All revenue and expenses incurred after April 30, 2004 will be the responsibility of Steven A. Ivester and Michael G. Surprenant with the following exceptions...." Under the section titled "Income/Revenue," item number ten stated, "Awards from law suites [sic] filed for Health Insurance problems." The agreement also excluded ten items under the section titled "Expenses/Liabilities." Only four of the ten items are pertinent to this appeal:
   1. Nominal attorney fees ... for pursuing E & O [errors and omissions] coverage related to previous Health problems
   2. Workers Comp claim payments, if needed, to ISI [Ideal Solutions, Inc.] employers while ISI was self-insured
   ...
   9. Expenses related to correcting mistakes and day to day client activities for clients prior to May 1, 2004
   10. Any other expenses/liabilities as agreed to by all partners
   All partners must approve any expenses or liabilities after April 30, 2004 in writing.

incidents which occurred more than two years prior to the April 30, 2004 agreement. However, the parties disagreed about the interpretation of the April 30, 2004 agreement as it related to the health insurance and workers' compensation insurance claims. Harris claimed the April 30, 2004 agreement excused him from any responsibility for any claims that were unknown at the time the agreement was executed. Ivester and Surprenant contended the agreement included the newly-filed claims.

Harris filed a complaint against Ivester and Surprenant in circuit court on January 15, 2005; however, by agreement, the parties waived a jury trial and referred the matter to the master with leave to appeal directly to the Court of Appeals. The parties referred the matter to the master for the purposes of dissolving the joint business entity on partnership principles; conducting an accounting as to assets, liabilities, and interpreting the agreement of the parties as to the dissolution of the business relationship. The master found the April 30, 2004 agreement to be ambiguous and allowed parol evidence to determine the parties' intent. In the final order of dissolution, the master held the agreement included the health care claims that arose prior to April 30, 2004, but became known after April 30, 2004.[3] This appeal followed.

## STANDARD OF REVIEW

An action to construe a contract is an action at law. *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). "In an action at law, tried without a jury, the trial court's findings of fact will not be disturbed unless found to be without evidence which reasonably supports the court's findings." *Stanley v. Atl. Title Ins. Co.*, 377 S.C. 405, 409, 661 S.E.2d 62, 64 (2008).

## LAW/ANALYSIS

### I. Separation Agreements

Harris argues the master erred in finding the separation agreements were ambiguous. We disagree.

---

**3.** The master's order also ordered that Harris "immediately pay to the partnership the $48,636.75 he has withheld, and such payment shall be made immediately on the filing and service of this Order." Harris did not appeal this amount.

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *McGill v. Moore*, 381 S.C. 179, 185, 672 S.E.2d 571, 574 (2009) (quoting *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003)). A contract must be read as a whole document so that ambiguity is not created by a single sentence or clause. *Id.* Whether the contract is ambiguous is a question of law for the court. *Id.* "A contract is ambiguous when the terms of the contract are reasonably susceptible to more than one interpretation." *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 242, 672 S.E.2d 799, 803 (Ct.App.2009) (quoting *S.C. Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 302 (2001)). If an agreement is found to be ambiguous, the court should seek to determine the parties' intent. *Ward v. West Oil Co.*, 379 S.C. 225, 239, 665 S.E.2d 618, 626 (Ct.App.2008). "[W]hen the written contract is ambiguous in its terms, ... parol and other extrinsic evidence will be admitted to determine the intent of the parties." *Charles v. B & B Theatres, Inc.*, 234 S.C. 15, 18, 106 S.E.2d 455, 456 (1959).

Harris argues the three agreements made between the parties should be construed as one contract and considered as a whole to determine the parties' intentions.[4] "The general rule is that, in the absence of anything indicating a contrary intention, where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the Court will consider and construe them together." *Cafe Assocs. v. Gerngross*, 305 S.C. 6, 10, 406 S.E.2d 162, 164 (1991). In *Cafe Associates*, the Court found the master did not err in reading the Asset Purchase Agreement and the Covenant Not to Compete together because the two agreements were substantially the same, covered the same subject matter, and were executed during the course of the same transaction by the same parties for the same purpose. *Id.* at 10, 406 S.E.2d at 164–65.

---

4. The other two agreements Harris refers to are the two March 30, 2004 separation agreements, one for Ideal Solutions and one for Carolina Pay.

Here, however, the two March 30, 2004 agreements were signed before Ivester and Surprenant decided to remain partners. Thus, the situation had changed when the April 30, 2004 agreement was signed. As a result, the three agreements were not executed during the course of the same transaction for the same purpose. Thus, the March 30, 2004 agreements should not be construed as the same agreement as the April 30, 2004 agreement.

■■ Harris argues the language of the April 30, 2004 agreement established that no new expenses or liabilities were to be incurred unless they were specifically agreed to by the parties and there was no evidence Harris agreed to accept liability for health claims or attendant attorneys' fees after April 30, 2004. Harris asserts the agreement provided that Ivester and Surprenant were to be responsible for all expenses arising after April 30, 2004, including the new health claims. He also maintains item number nine under the expenses and liabilities section of the April 30, 2004 agreement should not be read to include the claims from the insurance company fraud that happened more than two years prior to the signing of the agreement. Harris testified his goal when drafting the agreement was "to make sure that we all documented what we needed to document here right upfront before I left" and that all the assets and liabilities were identified. He also testified it was his understanding that the errors and omissions insurance would take care of all the health insurance claims that were pending in April 2004.

Ivester and Surprenant argue the later-filed health claims were a liability that existed prior to the April 30, 2004 agreement; thus, they were implicitly included in the agreement. They argue they did not specifically include the health claims in the April 30, 2004 agreement because they did not know how much the claims were going to be. Also, Ivester testified they did not include them in the agreement because "[a]t that time [they] really thought that [they] would be able to get awards from Mr. Brown and other people by bringing lawsuits against them to pay for anything that would come up." However, the agreement specifically includes workers' compensation claim payments even though Ivester testified they did not know at that time exactly how much they were going to have to pay. They also included "nominal" attorneys'

fees for the health insurance claims. Additionally, various other income and expenses that they did not know the exact amount of were included in the agreement. Ivester testified there were no new agreements signed by Harris after the April 30, 2004 agreement.

Surprenant testified Harris knew there were pending health care claims, and the partners would be personally liable if they were not covered by the insurance. Thus, he argues the health care claims were a known liability at the time the April 30, 2004 agreement was signed. He further testified the partners had discussions about the future health claims, and they all agreed they would continue to pay them as they had paid them in the past. Surprenant testified item number nine of the expenses and liabilities section of the April 30, 2004 agreement covered any mistakes created prior to the split up of the partners and those would be liabilities of the partnership. He also testified item number nine included the pending health care claims.

Daniel Livengood, who was Ideal Solutions' accountant and was involved in the agreement negotiations, testified that during one of the meetings, he was told that item number nine under the expense and liability section of the April 30, 2004 agreement was to be viewed "as a catchall for other items that might occur after ... May 1st, but be tied back to having accrued prior to that time." Livengood testified that purchasing fraudulent health insurance was a mistake that would fall under this category, and thus, the April 30, 2004 agreement included the pending health care claims. He also testified all three partners discussed the contingent claims from the health care fraud and the attorneys' fees were a contingent liability because they resulted from actions that were taken prior to April 30, 2004. He further testified the health care claims were paid by Ideal Solutions prior to the April 30, 2004 agreement.

The master found the April 30, 2004 agreement was ambiguous and admitted parol evidence to determine the intent of the parties concerning the health care claims filed after the date of the agreement. The master found Livengood's testimony was "determinative of the intention of the partners to their agreement as to whether [the health care] claims were to be

included as a liability under item [nine], *'Expenses/Liability.'* "
The master further found Harris's interpretation of the agree-
ment would lead to an absurd result because he would share
with his partners the awards from lawsuits filed for health
insurance problems, but would not be responsible for health
care claims that were filed after April 30, 2004. Therefore,
the testimony supports the master's finding that the parties
intended for the later-filed health care claims to be included in
the agreement as a liability of the partners.

## II. Liabilities

Harris argues that if the agreements were ambiguous, the
master erred in including the health insurance claims and
attendant attorneys' fees as liabilities of all three parties
because they were not specifically included in the parties'
agreement. We disagree.[5]

Harris argues the April 30, 2004 agreement covered the
issues regarding the health insurance fraud and he was not
responsible for expenses and liabilities that arose after April
30, 2004. Specifically, he argues the agreement mentioned the
health insurance claims and the attorneys' fees related to
them, but did not state he was liable for them. Also, the
agreement included workers' compensation claim payments,
but did not mention the health insurance claims that resulted
from the same event. Thus, Harris asserts Ivester and
Surprenant's failure to include the health insurance claims and
attorneys' fees in the April 30, 2004 agreement bars them
from now holding him partially responsible because the new
claims arose after the agreement was signed.

In contrast, Ivester and Surprenant assert the health care
claims were not specifically included in the April 30, 2004
agreement because they were an old liability, and thus, they
were implicitly included in the agreement. Surprenant testi-
fied item number nine under the expenses and liabilities
section of the April 30, 2004 agreement covered any mistakes
created prior to the split up of the partners and those would
be liabilities of the partnership. He also testified item num-
ber nine included the pending health care claims. He further
testified the partners had discussions about the future health

---

5. This issue addresses Harris's second and third issue.

claims and they all agreed they would continue to pay them as they had been.

■ Additionally, Livengood testified item number nine was a catchall for other items that might occur after the agreement was signed, but had accrued prior to that time. He also testified that purchasing fraudulent health insurance was a mistake that would fall under this category, and thus, the April 30, 2004 agreement included the pending health care claims. He further testified all three partners discussed that the health care fraud and attorneys' fees were a contingent liability because they resulted from actions that were taken prior to April 30, 2004. Therefore, the evidence supports the master's finding that Harris was responsible for health insurance claims and attendant attorneys' fees that arose after April 30, 2004.

## CONCLUSION

Accordingly, the master's order is

**AFFIRMED.**

WILLIAMS and LOCKEMY, JJ., concur.