749 S.E.2d 139

Melissa Anne YORK and Olga Joanne Cristy, Appellants,

v.

**DODGELAND OF COLUMBIA, INC. and Jim Hudson Automotive Group, and Jim Hudson Superstore, a/k/a Jim Hudson Hyundai, Respondents.**

Appellate Case No. 2011–199006.

No. 5169.

Court of Appeals of South Carolina.

Heard June 12, 2013.
Decided Sept. 4, 2013.

68

70

Patrick E. Knie, of Patrick E. Knie, PA, of Spartanburg, and William Angus McKinnon and Susan Foxworth Campbell,

both of McGowan Hood & Felder, LLC, of Rock Hill, for Appellants.

Rebecca Laffitte and John Michael Montgomery, both of Sowell Gray Stepp & Laffitte, LLC, Claude E. Hardin, Jr., of Hardin Law Firm, LLC, and Steven W. Hamm and Jo Anne Wessinger Hill, both of Richardson Plowden & Robinson, PA, all of Columbia, for Respondents.

GEATHERS, J.

Appellants argue the trial court erred in granting Respondents' motions to dismiss and to compel arbitration. Because every dispute was within the scope of at least one valid arbitration agreement, the trial court did not err in dismissing Appellants' suit and compelling arbitration.

## FACTS/PROCEDURAL BACKGROUND

This case involved two plaintiffs, Appellant Melissa York (York) and Appellant Olga Cristy (Cristy), with each alleging an automobile dealership charged illegal documentation fees. Notably, each plaintiff's respective claim arose from separate transactions occurring at separate dealerships; although York and Cristy filed suit together, York's two claims were against Dodgeland of Columbia, while Cristy's sole claim was against Jim Hudson Hyundai. Because the underlying case involved three vehicle purchases, one consumer loan, and two distinct sets of parties, as memorialized within four separate contracts, extensive factual review and analysis is necessitated.

### *York/Dodgeland Transactions*

On September 4, 2006, York and her husband, Jessie York (Husband), entered into two purchase agreements with Dodgeland of Columbia for two pre-owned vehicles, a Dodge Ram pickup and a Chevy Trailblazer. The purchase agreement (Buyers Order) for the Ram reflected York and Husband as "co-purchasers," the agreed selling price, a trade allowance, a trade pay-off balance, $289 in "processing fees," and tax, tag, and title fees. The record does not indicate whether the Yorks financed the $29,643 balance owed under this contract. At the top of this Buyers Order, in emboldened, capitalized letters, appeared the following language: **"THIS BUYERS ORDER IS SUBJECT TO ARBITRATION PUR-**

SUANT TO S.C. CODE SECTION 15–48–10." Additionally, at the bottom of this Buyers Order, was the following language:

IN CONSIDERATION FOR SELLER AGREEING TO SELL TO PURCHASER THE ABOVE DESCRIBED VEHICLE, PURCHASER AGREES THAT ANY AND ALL DISPUTES IN ANY WAY RELATED TO ANY NEGOTIATION OR POTENTIAL PURCHASE, FINANCING, OR ACTUAL PURCHASE OF ANY VEHICLE OR SERVICE FROM DEALER SHALL BE SUBJECT TO THE FEDERAL ARBITRATION ACT. BUYER UNDERSTANDS AND AGREES THAT THIS TRANSACTION INVOLVES INTERSTATE COMMERCE AND THAT NO ACTION IN A REPRESENTATIVE CAPACITY MAY BE FILED WITH THE ARBITRATOR AND THAT ARBITRATOR HAS NO AUTHORITY TO AWARD ANY RELIEF TO ANYONE OTHER THAN THE ABOVE NAMED PURCHASER OR SELLER AND THAT ARBITRATOR SHALL DECIDE ALL ISSUES OF ARBITRABILITY.

While this document indicated that additional terms existed on the "reverse side hereof," that portion of the document is not part of the Record on Appeal.

The Buyers Order for the Chevy Trailblazer transaction reflected York and Husband as "co-purchasers," the agreed selling price, $289 in "processing fees," and tax, tag, and title fees. The record does not indicate whether the Yorks financed the $18,143 balance owed under this contract. This contract incorporated the same language found within the Buyers Order for the Ram pickup, although the arbitration notice header was underlined and in a bigger font. The reverse side of this document is not part of the Record on Appeal.

### Cristy/Jim Hudson Hyundai Transaction

We again note that no relationship existed between York and Cristy, and that Respondent Jim Hudson Hyundai was unaffiliated with Respondent Dodgeland. Thus, the parties and conduct associated with the York/Dodgeland transactions were distinct from those involved in the Cristy/Jim Hudson Hyundai transaction.

On March 28, 2008, Cristy purchased a new 2008 Hyundai Tucson from Jim Hudson Hyundai. Cristy signed two contracts: (1) a Buyers Order memorializing the terms of the sale of the vehicle by Jim Hudson Hyundai to Cristy; and (2) a Retail Installment Contract (Installment Contract) memorializing, *inter alia*, Cristy's debt and repayment obligations to BB & T, and BB & T's related obligation to pay the funded loan's proceeds to Jim Hudson Hyundai.

As to the Buyers Order, it reflected Cristy as the customer, the agreed selling price and trade allowance, as well as the pay-off balance of the trade-in, a manufacturer rebate, a $289 "processing fee," and tax, tag, and title fees. Under this agreement, Cristy owed the dealership $18,013. At the very top of this Buyers Order, in emboldened, capitalized, and underlined letters, appeared the following language:

***THIS CONTRACT IS SUBJECT TO ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, AND IF THE FEDERAL ARBITRATION ACT IS NOT APPLICABLE, THEN THIS CONTRACT IS SUBJECT TO ARBITRATION PURSUANT TO THE SOUTH CAROLINA UNIFORM ARBITRATION ACT.***

Additionally, at the very bottom of this Buyers Order, but directly above Cristy's signature, was the following language:

### ☜ SEE ADDITIONAL TERMS AND CONDITIONS ON OPPOSITE PAGE ☞

### CUSTOMER HAS READ **BOTH SIDES** OF THIS CONTRACT . . . .

The reverse side of this Buyers Order incorporated provisions further defining the scope and terms of arbitration, including remedy and claim type limitations.

While Cristy's Buyers Order evidenced the actual sale and purchase of the vehicle, her Installment Contract memorialized the terms of the financing arrangement (*i.e.*, the BB & T loan) procured to satisfy the balance owed under the aforementioned Buyers Order. In particular, the Installment Contract outlined, among other things, Cristy's and BB & T's, eventually mutual, financial obligations, such as: amount financed; to whom the funded loan proceeds should be remit-

ted; repayment period and monthly payment amounts; applicable interest rates, fees, and finance charges; and other loan related "terms" (*i.e.,* rights and restrictions). Pursuant to this agreement, Cristy was the buyer and debtor, the 2008 Hyundai was the collateral, BB & T was the creditor, lienholder, and Assignee, and Jim Hudson Hyundai was the seller, recipient of the funded loan proceeds, and assignor. Notably, the Installment Contract read, in pertinent part, as follows:

> [A]ny claim or dispute ... between you and us or our agents ... that arises out of or relates to your credit application, this Contract or any resulting transaction ... is to be decided by neutral, binding arbitration.... The Federal Arbitration Act ... governs [and] not any state [arbitration] law.

This contract also included provisions further defining the scope and terms of arbitration, including remedy and claim type limitations.

### *Allegations of Illegal Dealer Practices*

York and Cristy filed a single suit, on June 25, 2010, against Dodgeland of Columbia, Jim Hudson Automotive Group, and Jim Hudson Superstore, a/k/a Jim Hudson Hyundai.[1] York and Cristy alleged misleading business practices culminated in the charging of illegal administration fees, which artificially raised the agreed purchase prices and, thereby, impermissibly increased the dealers' profits. The complaint also stated that it was filed "for the benefit of all others."[2]

Dodgeland and Jim Hudson Hyundai filed motions to dismiss and to compel Arbitration, which the trial court granted. The trial court denied Appellants' Rule 59(e) motion and this appeal followed.

---

1. While York was a named Plaintiff, Husband was not. Also, Jim Hudson Automotive Group was uninvolved in Cristy's purchase from Jim Hudson Cars, L.L.C. d/b/a, Jim Hudson Hyundai. Furthermore, Jim Hudson Superstore is not an official name for Jim Hudson Hyundai.

2. S.C.Code Ann. § 56–16–110(2) (2006) (authorizing "one or more may sue for the benefit of the whole").

## ISSUES ON APPEAL

1. Did the trial court err in finding valid any of the arbitration agreements or any provisions or subparts, thereof?

2. Did the trial court err in finding Appellants' claims were within a valid arbitration agreement's scope?

3. Did the trial court err in denying arbitration-related discovery?

## STANDARD OF REVIEW

 Whether a claim is subject to arbitration is an issue for judicial determination. *Partain v. Upstate Auto. Grp.*, 386 S.C. 488, 491, 689 S.E.2d 602, 603 (2010). While this determination by a trial court is reviewed de novo, an appellate court will not reverse this finding if it is reasonably supported by the evidence. *Id.*

## LAW/ANALYSIS

### I. Valid Arbitration Agreements Existed.

 Whether a valid arbitration agreement exists is a matter for judicial determination. *Partain*, 386 S.C. at 491, 689 S.E.2d at 603; *see Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 23–24, 644 S.E.2d 663, 668 (2007) (finding a "gateway matter" to arbitrability is the existence of an agreement to arbitrate). In making this determination, trial courts consider "general contract defenses" to ensure a meeting of the minds to arbitrate existed, and that such an agreement was not the result of "fraud, duress, [or] unconscionability." *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 593, 553 S.E.2d 110, 116 (2001).

The trial court did not err in finding York, as well as Cristy, was bound by a valid arbitration agreement because each Appellant entered into an arbitration agreement that (A) complied with the Federal Arbitration Act (FAA); (B) evidenced intent to arbitrate; (C) was not unconscionable; and (D) was not void as against public policy.

## A. All Contested Arbitration Agreements Involved Interstate Commerce and Complied With the FAA.

Pursuant to Section 2 of the FAA, a "written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2013). Because "involving commerce" means the "functional equivalent of 'affecting commerce,'" the FAA's reach includes the "full breadth of the Commerce Clause." *Zabinski*, 346 S.C. at 590–91, 553 S.E.2d at 115 (quoting *Allied–Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 274, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)); *accord Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003); *see Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001) (stating, unless the parties agreed to the contrary, the FAA applies to any transaction involving interstate commerce, regardless of whether the parties contemplated an interstate transaction). Thus, an arbitration agreement that complies with the FAA and that exists within a contract to purchase or finance a vehicle preempts any *state arbitration-specific law* that would otherwise invalidate the arbitration agreement. *See Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir.2000) (holding contracts for the purchase and financing of a vehicle involve interstate commerce); *Simpson*, 373 S.C. at 22 n. 1, 644 S.E.2d at 667 n. 1 (finding a vehicle trade-in contract involves interstate commerce); *Zabinski*, 346 S.C. at 590, 553 S.E.2d at 116 (stating the FAA supersedes state arbitration-specific law that would invalidate an arbitration agreement).

In the instant matter, each contract involved interstate commerce and evidenced an intent to settle disputes by arbitration. Accordingly, the trial court properly determined the FAA applied and the FAA's requirements were met.

## B. All of the Contested Arbitration Agreements Evidenced An Agreement To Arbitrate.

Notwithstanding the fact that the contested arbitration agreements complied with the FAA and, thus, potential invali-

dation under state arbitration-specific law was preempted, York and Cristy must still have agreed, as a matter of general state contract law, to arbitrate. *Zabinski,* 346 S.C. at 593, 553 S.E.2d at 116 (holding while "state law[ ] [that is] applicable *only* to arbitration provisions" and that would invalidate an FAA compliant arbitration provision is preempted, "general contract defenses," which exist under state law and apply to *all* contracts, are not preempted); *Munoz,* 343 S.C. at 539, 542 S.E.2d at 364 ("General contract principles of state law apply to arbitration clauses governed by the FAA." (citing *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 685, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996))); *see Simpson,* 373 S.C. at 23–24, 644 S.E.2d at 668 (finding a "gateway matter" to arbitrability is whether a valid agreement to arbitrate existed). Thus, a party challenging an FAA compliant arbitration provision may still argue no meeting of the minds to arbitrate existed.

Appellants argue no meeting of the minds to arbitrate existed because: (1) York's agreements did not unambiguously demonstrate intent to arbitrate; (2) York's agreements omitted material and essential terms; and (3) Cristy's agreements incorporated inconsistent and conflicting terms.

### 1. *York's Arbitration Agreements Were Not Ambiguous.*

York cites *Traynham v. Yeargin Enterprises, Inc.,* for the proposition that it is improper to compel arbitration when the underlying agreement is ambiguous about whether the parties agreed to arbitrate. 304 S.C. 188, 190–91, 403 S.E.2d 329, 330 (Ct.App.1991). In *Traynham,* Article 1 of the executed contract sought to incorporate terms existing within Article 7; Article 7, however, was not attached to the signed document. *Id.* Thus, the court in *Traynham* found the contract, when "viewed in its totality[,] created an ambiguity which was litigable as to whether the parties agreed to arbitration." *Id.*

York's contracts are quite distinguishable from the contract in Traynham. York's contracts incorporated an arbitration notice on the top of the first page, as well as a provision clarifying that all disputes within the scope of the arbitration agreement must be arbitrated. This stands in stark contrast to the ambiguous contract in Traynham that lacked any actual arbitration language.

■ York further argues ambiguity existed because her contracts were only "subject to" the FAA and, according to her proffered definition, being "governed or affected by" the FAA does not mean she unambiguously intended to waive her right to a jury trial. Her contracts provided, in pertinent part, as follows:

PURCHASER AGREES THAT ANY AND ALL DISPUTES IN ANY WAY RELATED TO ANY NEGOTIATION OR POTENTIAL PURCHASE, FINANCING, OR ACTUAL PURCHASE OF ANY VEHICLE OR SERVICE FROM DEALER SHALL BE SUBJECT TO THE FEDERAL ARBITRATION ACT....

(emphasis added).

■ "Where an agreement is clear and capable of legal interpretation, the court's only function is to interpret its lawful meaning, discover the intention of the parties as found within the agreement, and give effect to it." *Park Regency, LLC v. R & D Dev. of the Carolinas, LLC,* 402 S.C. 401, 412–13, 741 S.E.2d 528, 534 (Ct.App.2012); *accord Heins v. Heins,* 344 S.C. 146, 158, 543 S.E.2d 224, 230 (Ct.App.2001) (stating the court must interpret contractual language in its natural and ordinary sense). Furthermore, a party who signed a contract is deemed to have read and understood "the effect" of the contract. *Wachovia Bank v. Blackburn,* 394 S.C. 579, 585, 716 S.E.2d 454, 458 (Ct.App.2011). Here, the contractual language "be[ing] subject to the Federal Arbitration Act" means, in light of FAA Section 2 and the ordinary meaning of "subject to," that all disputes within the scope of the provision must be arbitrated. *See* 9 U.S.C. § 2 ("A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable ....."); *Random House Dictionary, Webster's Third New International Dictionary,* 2275 (3d ed.2002) (defining "subject" as "falling under or submitting to the power or dominion of," as in *"be subject to the laws "* (emphasis added)); The American Heritage College Dictionary, 1352 (3d ed.1997) (defining "subject" as "under the power or authority of"); *Funk and Wagnalls Standard Desk Dictionary,* 671 (1984) (defining "subject" as "under the power of," "yielding" to, or "affected by: with to: *subject to "*). Hence, this contractual

language indicated the parties' unambiguous, mutual intent to arbitrate.

### 2. *York's Arbitration Agreements Did Not Omit Material and Essential Terms.*

 Referencing *Grant v. Magnolia Manor–Greenwood, Inc.,* York argues her arbitration agreements are invalid because they omitted the following material terms: how an arbitrator is chosen; what discovery rules apply; how arbitration fees are allocated; and how arbitration is initiated. 383 S.C. 125, 130, 678 S.E.2d 435, 438 (2009) (stating South Carolina law requires an arbitration agreement to reflect a "meeting of the minds . . . with regard to all essential and material terms").

In *Grant,* an arbitration agreement specifically required a particular entity to serve as arbitrator; it did not, however, specify an alternate arbitrator or a mechanism to select an alternate. *Id.* at 128, 678 S.E.2d at 437. After the designated entity was no longer able to serve as arbitrator, a dispute arose. *Id.* Finding the specification of the named arbitrator was a material term of the agreement and that this material term was rendered ineffective, our supreme court held arbitration was no longer required. *See id.* at 128–132, 678 S.E.2d at 437–39 ("Where designation of a specific arbitral forum has implications that may substantially affect the substantive outcome of the resolution, we believe that it is neither 'logistical' nor 'ancillary.' "). The court also held the default selection mechanism within FAA Section 5 was inapplicable when the parties make a specific arbiter an integral term. *Id.* at 131, 678 S.E.2d at 438.

 Although *Grant* does require all material terms to exist within an arbitration agreement for a meeting of the minds to result, each term that York alleges to be absent from her contract is distinguishable from the material terms required under *Grant.* First, the lack of a specified arbiter is not an omission of a material term. While the *Grant* court held that a named arbitrator is a material term *when one is specified within an agreement,* and that FAA Section 5 does not apply when *such a specification exists,* these holdings are inapplicable when the contract does not specify a particular

arbitrator, i.e., make the chosen arbitrator a material term. In fact, this is the exact situation to which Section 5 of the FAA applies. *See* 9 U.S.C.A. § 5 (2013) (providing a mechanism to select an arbiter when the agreement does not do so). Second, York cites no authority for the proposition that discovery rules, cost allocations, or arbitration initiation procedures are material terms that an arbitration agreement must explicitly designate. Rather, these terms are "ancillary logistical" ones not required within an arbitration agreement. *Cf. Grant*, 383 S.C. at 131–32, 678 S.E.2d at 439 (distinguishing between "integral terms," which "may substantially affect the substantive outcome," with "ancillary logistical concerns," which do not).

### 3. *Cristy's Arbitration Agreements Did Not Incorporate Inconsistent or Irreconcilable Terms.*

■■■ Cristy argues no meeting of the minds existed to arbitrate because the arbitration provisions within her Buyers Order and Installment Contract were inconsistent and conflicting. Cristy, citing *Harris v. Ideal Solutions, Inc.*, 385 S.C. 74, 79, 682 S.E.2d 523, 526 (Ct.App.2009), posits that because the "two contracts [were] executed at the same time on the same subject, they are treated as unitary" and, thus, the conflict between the two arbitration clauses prevented any meeting of the minds to arbitrate. While we agree *Harris* is applicable, we disagree with Cristy's interpretation of the case's holding.

■■■ "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Id.* (citation and quotation marks omitted). "[I]n the *absence of anything indicating a contrary intention*, where instruments are executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction, the Court will consider and construe them together." *Id.* (emphasis added).

In the instant matter, Cristy's Buyers Order and Installment Contract should not be construed together because the parties stated their intent to consider them separately:

This contract for sale is entered into between Jim Hudson Hyundai, hereinafter called Dealer, and Customer, as identi-

fied below. *Any retail installment contract* or other document executed by Customer in connection herewith *is simply a means of satisfying* Customer's obligations under *this Contract of Sale....*

(emphases added).

This language demonstrates Cristy and Jim Hudson Hyundai explicitly intended a demarcation between the two contracts. *See McGill v. Moore,* 381 S.C. 179, 185–86, 672 S.E.2d 571, 575 (2009) (examining contractual language to ascertain the parties' intentions and giving it legal effect). Further, this memorialized intent precludes construing the two contracts together. *See Harris,* 385 S.C. at 79, 682 S.E.2d at 526 (stating the general rule that "anything indicating a contrary intention" precludes a court from construing contracts together, even though they were executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction). Therefore, Cristy's arbitration agreements did not incorporate inconsistent or irreconcilable terms. *Id.*

Furthermore, even if we accept the litigants' concession that these two contracts should be construed together, Term 14 of the Buyers Order negates the existence of any inconsistent or irreconcilable terms. Term 14 expressly permitted modification of the Buyers Order's terms when new terms were "evidenced in writing and signed by Customer and an authorized representative of Dealer." *Cf. U.S. Bank Trust Nat'l Ass'n v. Bell,* 385 S.C. 364, 374, 684 S.E.2d 199, 204 (Ct.App. 2009) (stating a contract can be modified by another contract that includes a meeting of the minds on essential terms). Thus, if the subsequently executed Installment Contract effectuated a valid modification to the arbitration terms of the Buyers Order, no inconsistencies existed. Here, Cristy and Jim Hudson Hyundai executed the Installment Contract, which contained revised arbitration terms, after they had already agreed to the purchase/sale within the executed Buyers Order.[3] Thus, even if the two contracts were construed together, no inconsistencies would exist.

---

**3.** The Buyers Order reflects an unpaid, "Balance Due" of $18,013. The Installment Contract, however, reflects that Cristy financed $18,463. This $450 difference is due to Cristy's election to purchase GAP Insurance. Because Cristy opted to purchase and finance GAP Insurance

## C. Unconscionability, as to Cristy.[4]

 Just as state law determines whether an agreement to arbitrate existed under the FAA, courts may invalidate arbitration agreements on general state law "contract defenses, such as fraud, duress, and unconscionability." *Zabinski*, 346 S.C. at 593, 553 S.E.2d at 116; *accord Munoz*, 343 S.C. at 539, 542 S.E.2d at 364 ("General contract principles of state law apply to arbitration clauses governed by the FAA." (citing *Doctor's Assoc., Inc.*, 517 U.S. at 685, 116 S.Ct. 1652)); *see* 9 U.S.C. § 2 (providing grounds "at law or in equity for the revocation of any contract" remain applicable). In South Carolina, unconscionability is "the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Simpson*, 373 S.C. at 24–25, 644 S.E.2d at 668. Thus, unconscionability is "due to *both* an absence of meaningful choice and oppressive, one-sided terms." *Id.* at 25, 644 S.E.2d at 669 (emphasis added).

In light of the two prongs of the unconscionability analysis, we must determine whether: (1) the arbitration agreements within Cristy's Buyers Order and her Installment Contract were tainted by the absence of meaningful choice; and (2) oppressive and one-sided arbitration terms existed only within Cristy's Buyers Order.

---

*after she agreed to purchase the vehicle, i.e.,* signed the Buyers Order, the Installment Contract was necessarily executed after the Buyers Order.

4. While the first pages of York's Buyers Orders indicate that additional "terms and conditions" exist on "the reverse side," these portions of the documents were not part of the Record on Appeal. Appellant also indicated these portions were not presented to the trial court. Because of the limited nature of the Record on Appeal in this regard, and the fact that the arbitration provisions existing within the included first pages do not demonstrate oppressiveness, we do not further review York's Buyers Orders for unconscionability. *See Beverly S. v. Kayla R.*, 395 S.C. 399, 401–02, 718 S.E.2d 224, 225–26 (Ct.App.2011) (noting an appellant bears the burden of providing a record on appeal sufficient for intelligent review); Rule 210(h), SCACR ("[T]he appellate court will not consider any fact which does not appear in the Record on Appeal.").

### 1. *Absence of Meaningful Choice.*

Absence of meaningful choice on the part of one party speaks to the fundamental fairness of the bargaining process. *Id.* "In determining whether a contract was tainted by an absence of meaningful choice, courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause." *Id.* (internal citations and quotation marks omitted). As our supreme court noted in *Simpson*, the "loss of the right to a jury trial" and foregoing statutorily provided remedies are also relevant to this determination. *Id.* at 27, 644 S.E.2d at 670. Furthermore, an adhesion contract for the purchase of an automobile receives "considerable skepticism," although it is not, per se, unconscionable. *Id.* at 27, 644 S.E.2d at 669–70. We now analyze *each* of Cristy's arbitration agreements for the absence of meaningful choice.

### a. The Arbitration Agreement Within Cristy's Buyers Order.

Initially, we note that Cristy's Buyers Order is an adhesion contract. *See id.* at 26–27, 644 S.E.2d at 669 ("[A]n adhesion contract is a standard form contract offered on a 'take-it-or-leave-it' basis with terms that are not negotiable."). Aside from the selection of the desired vehicle VIN and figures dependent upon the agreed price, the remaining terms of sale, many of which are quite significant, were pre-printed and, presumptively, non-negotiable. Such pre-printed terms included, *inter alia*, disclaimer of warranty, arbitration provisions, prejudgment interest, attorney's fees, choice of law, and severability. Also, a footer on the Buyers Order stating "Richland County, SC Only" and reflecting a drafting date of "05/10/04" and a revision date of "06/09/06," further support the notion it was a form document. Accordingly, this Buyers Order was an adhesion contract and considerable skepticism is warranted.

Here, as in *Simpson*, Cristy lost her right to a jury trial and mandatory statutory remedies. See *id.* at 27–28, 644 S.E.2d

at 670 (considering the loss of the right to a jury trial and foregoing statutorily-required remedies "[i]n determining whether a contract was tainted by an absence of meaningful choice" (internal quotation marks and citation omitted)). Further, Cristy's single purchase was not a substantial business concern to Jim Hudson Hyundai and a significant disparity existed between the parties' relative bargaining power and sophistication. *See id.* at 25, 644 S.E.2d at 669 ("In determining whether a contract was tainted by an absence of meaningful choice, courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication. . . ." (internal quotation marks and citation omitted)). In light of these findings and the presence of an adhesion contract, Cristy lacked meaningful choice in agreeing to this arbitration agreement.

### b. The Arbitration Agreement Within Cristy's Installment Contract.

 Cristy's Installment Contract is also an adhesion contract and, hence, considerable skepticism is again warranted. *Id.* at 26–27, 644 S.E.2d at 670. The terms of this agreement also involved the waiver of the right to a jury trial. Further, Cristy was not a substantial business concern to either the assignor dealer or the assignee-lender, BB & T; a significant disparity existed between the parties' relative bargaining power and sophistication; and the arbitration agreement appeared only in small print on the reverse side of the document. Thus, the Installment Contract, like the Buyers Order, was tainted by the absence of meaningful choice. *Id.*

### 2. *Oppressive, One–Sided Terms.*

 Because the Installment Contract and the Buyers Order were tainted by the absence of meaningful choice, we must next determine whether either agreement incorporated oppressive, one-sided terms. *Id.* at 25, 644 S.E.2d at 669 (stating unconscionability is "due to *both* an absence of meaningful choice and oppressive, one-sided terms" (emphasis added)). To the extent either one did, that particular arbitration agreement was unconscionable; it would be tainted by the

absence of meaningful choice and oppressive, one-sided terms. *Id.* Terms are oppressive when "no reasonable person would make them and no fair and honest person would accept them." *See id.* at 25, 644 S.E.2d at 668.

### a. The Arbitration Agreement Within Cristy's Buyers Order.

Cristy argues two provisions within her Buyers Order arbitration agreement are oppressive and one-sided and that these provisions are not severable. We agree.

The first provision Cristy challenges as oppressive reads: "In no event shall the arbitrator be authorized to award punitive, exemplary, double, or treble damages (or any other damages which are punitive in nature or effect) against either party." Our supreme court held a *literally identical provision* oppressive and one-sided in Simpson. *Id.* at 28, 644 S.E.2d at 670. In *Simpson,* the underlying civil court complaint alleged, among other things, that the dealer violated the South Carolina Unfair Trade Practices Act (SCUTPA) and the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act (Dealers Act). *Id.* at 28–29, 644 S.E.2d at 670–71. Notably, the SCUTPA and Dealers Act required a court to award treble and double damages, respectively, for violations.[5] After our supreme court noted that a provision within the arbitration agreement "unconditionally permit[ed] the weaker party to waive these statutory remedies pursuant to an adhesion contract," the court then held that portion of the arbitration agreement "oppressive, one-sided, and not geared toward achieving an unbiased decision by a neutral decision-maker." *Id.* at 28–30, 644 S.E.2d at 670–71. Because the provision in Cristy's Buyers Order is *word-for-word identical* to the oppressive provision in Simpson, the provision within Cristy's contract is necessarily oppressive. *Id.* In light of this finding and the fact that Cristy lacked meaningful choice in agreeing to arbitrate, as previously discussed, the provision banning statutory remedies is unconscionable. *See id.* at 25, 644

---

**5.** S.C.Code Ann. § 56–15–110(1) (2006) (providing that an individual "shall recover double the actual damages by him sustained"); S.C.Code Ann. § 39–5–140(a) (1985) (providing that a "court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper").

S.E.2d at 669 (stating unconscionability is "due to *both* an absence of meaningful choice and oppressive, one-sided terms" (emphasis added)).

The second provision Cristy challenges allowed Jim Hudson Hyundai to retain repossession, foreclosure, and set-off rights, without regard to pending arbitration claims, while Cristy's sole remedy was arbitration. A "lack of mutuality of remedy in an arbitration agreement, on its own, does not make the arbitration agreement unconscionable." *Id.* at 31, 644 S.E.2d at 672; *see Munoz,* 343 S.C. at 542, 542 S.E.2d at 365 (holding that an arbitration agreement was not unconscionable where it allowed the lender to seek foreclosure while requiring the consumer to arbitrate any counterclaim). When an arbitration clause reserves judicial remedies for protecting the collateral by enforcement procedures specified by law (*e.g.,* replevin or foreclosure), the lack of mutuality is permissible if it bears a "reasonable relationship to the business risks inherent in secured transactions." *Simpson,* 373 S.C. at 31, 644 S.E.2d at 672 (internal quotation marks omitted). However, an "express stipulation that the dealer may bring a judicial proceeding that completely disregards any pending consumer claims that require arbitration," does not bear the requisite reasonable relationship and, therefore, is oppressive and one-sided.

The *Simpson* court reasoned that the clause's express stipulation that the dealer may bring a judicial proceeding, while disregarding any pending arbitration claims, "only act[s] to place an additional burden on the consumer to ensure that the vehicle in controversy is not disposed of in a court proceeding initiated by the dealer before the adjudication of the consumer's claims in arbitration." *Id.* at 32, 644 S.E.2d at 672. Thus, the dealer's retention of judicial remedies that entirely "supersede[d] the consumer's arbitral remedies" did not bear a sufficiently reasonable relationship to risks inherent in secured transactions and it did not promote a neutral arbitral forum. *Id.* Hence, the provision was oppressive. *Id.*

The arbitration clause within Cristy's agreement, which was virtually identical to the oppressive and one-sided clause in *Simpson,* read, in pertinent part, as follows:

[N]othing in this Contract shall require Dealer to submit to arbitration any claims by Dealer against Customer for claim and delivery, repossession, injunctive relief, or monies owed by Customer in connection with the purchase or lease of any vehicle, and any claims by Dealer for the remedies shall not be stayed pending the outcome of arbitration.[6]

Because this clause enables Jim Hudson's judicial remedies to supersede Cristy's arbitral remedies, and because the clause parallels the oppressive language in *Simpson*, it is similarly oppressive and one-sided. In light of this finding and Cristy's lack of meaningful choice in agreeing to arbitrate, as previously discussed, this provision is also unconscionable. Thus, two provisions within this arbitration agreement are unconscionable.

 Additionally, we find these two unconscionable provisions are not severable and, therefore, the entire arbitration agreement is invalid. Although courts sometimes strike unconscionable provisions of an arbitration agreement, "severability is not always an appropriate remedy." *Simpson*, 373 S.C. at 33–34, 644 S.E.2d at 673; *see* S.C.Code Ann. § 36–2–302(1) (2006) (permitting courts to refuse to enforce any clause "so as to avoid an unconscionable result"). " 'If illegality pervades the arbitration agreement such that only a disintegrated fragment would remain after hacking away the unenforceable parts, the judicial effort begins to look more like rewriting the contract than fulfilling the intent of the parties.' " *Simpson*, 373 S.C. at 34, 644 S.E.2d at 674 (quoting *Booker v. Robert Half Int'l Inc.*, 413 F.3d 77, 84–85 (D.C.Cir. 2005)). Further, South Carolina's "general principle . . . is that it is not the function of the court to rewrite contracts for the parties." *Id.*

In *Simpson*, the court found three separate provisions individually unconscionable and invalidated the entire arbitration agreement:

[W]e find the arbitration clause . . . wholly unconscionable and unenforceable based on the cumulative effect of a number of oppressive and one-sided provisions. . . . While this Court does not ignore South Carolina's policy favoring

---

6. *Accord id.* at 31, 644 S.E.2d at 672.

arbitration, we hold that the intent of the parties is best achieved by severing the arbitration clause in its entirety rather than 'rewriting' the contract by severing multiple unenforceable provisions.

*Id.* at 34–35, 644 S.E.2d at 674 (footnote omitted). Likewise, two *key* provisions within Cristy's arbitration agreement are unconscionable. Thus, the aforementioned clauses are not severable and the entire arbitration agreement is unenforceable.

> b. The Arbitration Agreement Within
> Cristy's Installment Contract.

■■■ Unlike the unenforceable arbitration agreement within Cristy's Buyers Order, the arbitration agreement within Cristy's Installment Contract did not incorporate oppressive and one-sided terms; the arbitration agreement within the Installment Contract did not preclude the arbitrator from awarding mandatory statutory remedies and it did not incorporate a lack of mutuality of remedies. Further, provisions even existed to advance Cristy's filing and arbitrator fees and to preserve certain self-help remedies for *both* parties. Because this arbitration agreement does not incorporate oppressive and one-sided terms, it is not unconscionable despite the fact that it exists within an adhesion contract and was tainted by a lack of meaningful choice. *See id.* at 25, 644 S.E.2d at 669 (stating unconscionability is "due to *both* an absence of meaningful choice and oppressive, one-sided terms" (emphasis added)).

## D. Enforceability, in Light of Public Policy.

Both Appellants argue certain provisions within their respective arbitration agreements were void, as a matter of public policy. We disagree.

> 1. *Bans Against Group or Class*
> *Actions (York and Cristy).*

■■■ All of the contested arbitration agreements purport to ban group or class arbitration. The Dealers Act provides, in pertinent part, as follows:

> When such action is one of common or general interest to many persons or when the parties are numerous and it is

impracticable to bring them all before the court, one or more may sue for the benefit of the whole, including actions for injunctive relief.

§ 56–15–110(2). Noting that the "purpose of the Dealers Act is consumer protection," our supreme court held, in *Herron v. Century BMW (Herron I),* that a provision within an arbitration agreement that required purchasers to "waive[ ] their right to ... bring or participate in any class action or multi-plaintiff or claimant action in court or through arbitration," was void and unenforceable on public policy grounds. 387 S.C. 525, 535–36, 693 S.E.2d 394, 399–400 (2010) (alteration in original). Subsequently, however, the Supreme Court of the United States granted a petition for writ of certiorari, vacated our supreme court's *Herron I* judgment, and remanded with instructions for our supreme court to reconsider its decision invalidating the provision banning class arbitration, in light of the decision in *AT&T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). *Sonic Automotive, Inc., dba Century BMW v. Watts,* —— U.S. ——, 131 S.Ct. 2872, 179 L.Ed.2d 1184 (2011). Notably, in *Concepcion,* the Supreme Court of the United States held that state law is preempted when it "allows any party to a consumer contract to demand [classwide arbitration]," notwithstanding the presence of a class arbitration waiver in an otherwise valid arbitration agreement.[7] 131 S.Ct. at 1750; *see id.* at 1748 ("Requiring the *availability* of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." (emphasis added)).

On remand, our supreme court noted "the issue of preemption was not preserved for review in the South Carolina proceedings." *Herron v. Century BMW (Herron II),* 395 S.C. 461, 463, 719 S.E.2d 640, 641 (2012); *id.* at 469, 719 S.E.2d at 644 ("[T]he absence of a preemption discussion [in *Herron I*] is not attributable to this Court's failure to recognize or understand the arguments presented. Rather, Appellants failed to present the issue to us. . . ."). Our supreme court then disposed of the matter on preservation grounds and reinstated its original opinion without considering the preemp-

---

7. York and Cristy argue the Dealers Act affords them a state law right to bring class action, including class arbitration, claims.

tive effect of the FAA on the Dealers Act provision affording a right to pursue relief in a representative capacity. *Herron II*, 395 S.C. at 470, 719 S.E.2d at 645 ("[C]onsideration in light of *AT&T Mobility LLC v. Concepcion* is unwarranted.").

Although our supreme court technically "reinstated" its *Herron I* opinion, in light of (1) that case's profound preservation deficiencies; (2) the opinion of the Supreme Court of the United States vacating *Herron I*; and (3) the applicable holdings within *Concepcion*, the *Herron I* reinstatement did not signify a post-*Concepcion* position that the Dealers Act provision is immune to FAA preemption. Consistently, numerous other jurisdictions now apply *Concepcion* to preempt similar state laws that, if not preempted, would invalidate class action waivers on public policy grounds. *See Litman v. Cellco P'ship*, 655 F.3d 225, 231 (3d Cir.2011) (holding, in light of *Concepcion* and, thus, contrary to prior New Jersey state law, "the arbitration clause at issue here must be enforced according to its terms, which requires individual arbitration and forecloses class arbitration"); *Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1236 (11th Cir.2012) ("[W]e need not reach the question of whether Florida law would invalidate the class action waiver ... because, to the extent it does, it would be preempted by the FAA."); *Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1207 (11th Cir.2011) ("[I]n light of *Concepcion*, the class action waiver in the Plaintiff's arbitration agreements is enforceable under the FAA."); *id.* at 1215 ("To the extent that Florida law would require the availability of classwide arbitration procedures ... such a state rule is inconsistent with and thus preempted by FAA § 2."); *McKenzie Check Advance of Fla., LLC v. Betts*, 112 So.3d 1176, 1178 (Fla.2013) ("Applying the rational[e] of *Concepcion* ... we conclude that the FAA preempts invalidating the class action waiver in this case on the basis of it being void as against public policy."); *NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.*, 421 N.J.Super. 404, 24 A.3d 777, 781 (Ct.App.Div.2011) ("[W]e uphold the court's specific ruling that the class action waiver provisions in the [vehicle purchase] documents should not be invalidated on public policy grounds, a conclusion that is in keeping with ... [*Concepcion* ]."). Accordingly, the provisions banning class arbitration in the present case cannot be invalidated based upon public policy considerations embod-

ied within state law. Rather, the "the arbitration clause[s] at issue here must be enforced according to [their] terms, which requires individual arbitration and forecloses class arbitration." *Litman*, 655 F.3d at 231.

In York's arbitration agreement, she agreed that "no action in a representative capacity may be filed with the arbitrator and that arbitrator has no authority to award any relief to anyone other than the above named purchaser or seller." This provision is valid and must be enforced according to its terms. *Id.* Similarly, the arbitration agreement within Cristy's Installment Contract incorporated a requirement that Cristy "not ... participate as a class representative or class member on any class claim that [she] may have ..., including class arbitration." This provision is also valid and must be enforced according to its terms. *Id.*

### 2. *Limitations on Statutory Remedies (Cristy).*

As discussed within Section I, C, *supra*, the arbitration agreement within Cristy's Buyers Order was unconscionable and, thus, void. Because *general* state law contract defenses, such as unconscionability, remain effective, post-*Concepcion*, as a permissible basis for voiding an arbitration agreement, it is unnecessary to determine whether (1) state public policy law invalidates any particular provision within this arbitration agreement and (2) the potential preemptive effect of the FAA in this particular instance. *See Concepcion*, 131 S.Ct. at 1746–47 (recognizing generally applicable contract defenses, such as unconscionability, remain valid grounds to void an arbitration agreement, so long as the defense applies to all contracts and is not applied in a manner to specifically disfavor arbitration).

### E. Conclusions as to the Validity of the Arbitration Clauses.

The arbitration agreements within York's two Buyers Orders were valid because each: (A) complied with the FAA; (B) evidenced intent to arbitrate; (C) was not unconscionable; and (D) was not void as a matter of public policy.

The arbitration agreement within Cristy's Buyers Order (A) complied with the FAA and (B) evidenced intent to arbitrate.

Nonetheless, this agreement was (C) unconscionable and, thus, invalid in its entirety.

The arbitration agreement within Cristy's Installment Contract was valid because it: (A) complied with the FAA; (B) evidenced intent to arbitrate; (C) was not unconscionable; and (D) was not void as a matter of public policy.

## II. Appellants' Claims Were Within the Scope Of a Valid Arbitration Agreement.

We now address whether Appellants' claims fell within the scope of their respective, valid arbitration agreements, *i.e.,* the arbitration agreement(s) existing within either York's two Buyers Orders or Cristy's Installment Contract.

A court must determine whether the factual allegations underlying a claim are within the scope of an arbitration clause. *Partain,* 386 S.C. at 492–93, 689 S.E.2d at 604. Because "[t]he policy of the United States and of South Carolina is to favor arbitration of disputes," arbitration should generally be ordered, "[u]nless a court can say with positive assurance that the arbitration clause is not susceptible to any interpretation that covers the dispute." *Id.* at 491, 689 S.E.2d at 603–04. "A clause which provides for arbitration of all disputes 'arising out of or relating to' the contract is construed broadly" and is "capable of an expansive reach." *Landers v. FDIC,* 402 S.C. 100, 109, 739 S.E.2d at 213–14 (2013) (citations omitted). Thus, a claim is within the scope of an arbitration clause that purports to cover all related disputes, so long as a significant relationship exists between the claim and the contract containing the arbitration agreement. *Partain,* 386 S.C. at 493, 689 S.E.2d at 604.

### A. York Must Arbitrate Her Claims.

The arbitration clause appearing in York's two Buyers Orders applied to *"any and all disputes* in any way *related to any* negotiation or potential purchase, financing or *actual purchase of any vehicle* or service from dealer." (emphases added). Such broad language affords this clause an expansive reach. *Landers,* 402 S.C. at 109, 739 S.E.2d at 214. Thus, claims within the literal terms of the clause, as well as those claims with a significant relationship to the Buyers Order, are

subject to the terms of the arbitration agreement. *Partain,* 386 S.C. at 493, 689 S.E.2d at 604.

York alleged that Dodgeland charged her illegal documentation fees. This allegation is "related to ... the actual purchase" of the vehicle from the dealer, a dispute type explicitly recognized by the terms of the clause. Thus, York's claims were within the scope of a valid arbitration agreement. Accordingly, she must arbitrate her claims.

## B. Cristy Must Arbitrate Her Claim.

■ The arbitration clause within Cristy's Installment Contract covered *"any claim or dispute ... that arises out of or relates to* your credit application, *this Contract* or *any resulting transaction* or relationship, including those with third parties." (emphases added). This broad language affords the clause an expansive reach. *Landers,* 402 S.C. at 109, 739 S.E.2d at 214. Thus, claims within the literal terms of the clause, as well as those claims with a significant relationship to the Buyers Order, are subject to the terms of the arbitration agreement. *Partain,* 386 S.C. at 493, 689 S.E.2d at 604.

Cristy alleged that Jim Hudson Hyundai charged her an illegal documentation fee. Notably, the Installment Contract specifically lists the contested documentation fee within the "ITEMIZATION OF AMOUNT FINANCED." Thus, Cristy's dispute "arises out of or relates to ... this Contract." Moreover, because the Installment Contract provided Cristy with the "means" to purchase her vehicle, *i.e.,* satisfy her obligations owed under the Buyers Order, her claim also "arises out of or relates to ... any resulting transaction." Therefore, Cristy's claims were within the scope of this valid arbitration agreement and she must arbitrate these claims.

## III. Arbitration Related Discovery.

Finally, Appellants summarily argue the trial court erred in upholding the validity of the arbitration agreements without first allowing discovery. Yet, Appellants' brief fails to cite any law or authority that supports this *particular* proposition and, instead, relies upon an attenuated argument and a summary conclusion. Therefore, Appellants are deemed to have abandoned this issue. *See* Rule 208(b)(1)(D), SCACR ("The brief

of appellant shall contain ... the *particular* issue to be addressed ... followed by discussion and citations of authority." (emphasis added)); *Atl. Coast Builders & Contractors, LLC v. Lewis,* 398 S.C. 323, 327 n. 1, 730 S.E.2d 282, 284 n. 1 (2012) (finding an issue abandoned because appellant's brief was both unsupported by legal authority and relied upon a summary conclusion); *D.R. Horton, Inc. v. Wescott Land Co., LLC,* 398 S.C. 528, 548–49, 730 S.E.2d 340, 350–51 (Ct.App. 2012) (finding appellants' failure to cite supporting law or authority results in an issue being abandoned, despite the existence of a conclusory argument).

## CONCLUSION

The trial court did not err in dismissing Appellants' suit and compelling arbitration. Every dispute was within the scope of at least one valid arbitration agreement. Hence, the order of the trial court is

**AFFIRMED, AS MODIFIED.**

FEW, C.J. and LOCKEMY, J., concur.