# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Gregory W. Smith and Stephanie Smith, Respondents,

v.

D.R. Horton, Inc., Tom's Vinyl Siding, LLC, Lutzen Construction, Inc., Boozer Lumber Company, All American Roofing, Inc., Myers Landscaping, Inc., Defendants,

of whom D.R. Horton, Inc. is the Petitioner.

Appellate Case No. 2013-001345

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Dorchester County
Edgar W. Dickson, Circuit Court Judge

---

Opinion No. 27645
Heard March 3, 2015 – Filed July 6, 2016

---

## AFFIRMED

---

Matthew Kinard Johnson and W. Kyle Dillard, both of Ogletree Deakins Nash Smoak & Stewart, PC, of Greenville, for Petitioner.

Phillip Ward Segui, Jr., of Segui Law Firm, of Mt. Pleasant, John T. Chakeris, of Chakeris Law Firm, and

Michael A. Timbes, of Thurmond Kirchner Timbes & Yelverton, PA, both of Charleston, for Respondents.

**CHIEF JUSTICE TOAL:**     D.R. Horton, Inc., asks this Court to reverse the court of appeals' decision in *Smith v. D.R. Horton, Inc.*, 403 S.C. 10, 742 S.E.2d 37 (Ct. App. 2013), affirming the circuit court's refusal to compel arbitration between Gregory and Stephanie Smith (collectively, the Smiths) and D.R. Horton.  We affirm.

## FACTS/PROCEDURAL BACKGROUND

D.R. Horton is a corporation specializing in residential construction.  In March 2005, the Smiths entered into a home purchase agreement (the Agreement) with D.R. Horton for the design and construction of a new home in Summerville, South Carolina.

The Agreement is organized into numbered paragraphs and lettered subparagraphs, and sets forth the various responsibilities of the parties prior to and immediately following closing.[1]  Paragraph 14 of the Agreement is titled "Warranties and Dispute Resolution," and consists of subparagraphs 14(a) through 14(j).  Subparagraphs 14(c) and 14(g) contain provisions stating that the parties agree to arbitrate any claim arising out of D.R. Horton's construction of the home, as well as any disputes related to the warranties contained in the Agreement.  However, in the majority of the remaining subparagraphs of paragraph 14, D.R. Horton expressly disclaims all warranties for the home—including the implied warranty of habitability—except for a ten-year structural warranty.  Moreover, subparagraph 14(i) stipulates that D.R. Horton "shall not be liable for monetary damages of any kind, including secondary, consequential, punitive, general, special or indirect damages."  (Emphasis in original).

In August 2005, D.R. Horton completed construction of the Smiths' home, and the Smiths closed on the property and received the deed.  Thereafter, the Smiths experienced a myriad of problems with the home that resulted in severe

---

[1] For example, the Agreement requires the Smiths to obtain suitable financing to purchase the home prior to the start of construction and to deposit a specified amount of earnest money, and requires D.R. Horton to convey marketable title to the Smiths at the closing.

water damage to the property. D.R. Horton attempted to repair the alleged construction defects on "numerous occasions" during the next five years, but was ultimately unsuccessful.

In 2010, the Smiths filed a construction defect case against D.R. Horton and seven subcontractors. In response, D.R. Horton filed a motion to compel arbitration. The Smiths opposed the motion, arguing, *inter alia*, that the arbitration agreement was unconscionable and therefore unenforceable.

The circuit court denied D.R. Horton's motion to compel arbitration, finding that the arbitration agreement was unconscionable. The court based its ruling on "a number of oppressive and one-sided provisions," including D.R. Horton's attempted waiver of the implied warranty of habitability, as well as subparagraph 14(i)'s prohibition on awarding money damages of any kind against D.R. Horton. D.R. Horton made a motion to reconsider pursuant to Rule 59(e), SCACR, but the circuit court again denied the motion to compel.[2]

D.R. Horton appealed, and the court of appeals affirmed the circuit court's order. *See Smith*, 403 S.C. at 10, 742 S.E.2d at 37. The court of appeals found the arbitration agreement was unconscionable, citing subparagraph 14(i) and its prohibition on awarding money damages against D.R. Horton. *Id.* at 15, 742 S.E.2d at 40–41. Further, the court of appeals *sua sponte* conducted a severability analysis to determine whether subparagraph 14(i) could be severed from the remaining provisions of the arbitration agreement. *Id.* at 17, 742 S.E.2d at 41. The court of appeals ultimately concluded that severing the subparagraph would be inappropriate. *Id.*

D.R. Horton petitioned the court of appeals for rehearing, asserting that the court of appeals made two fundamental errors. First, D.R. Horton argued that the court of appeals' unconscionability analysis was flawed because it did not discuss whether the Smiths lacked a meaningful choice in entering the arbitration agreement. *See Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668 (2007) (stating that an unconscionability analysis has two prongs, one of which is whether one of the parties to the contract lacked a meaningful

---

[2] In the second order denying D.R. Horton's motion to compel arbitration, the court elaborated on its previous finding of unconscionability, finding that the Agreement was a contract of adhesion, and that the Smiths had significantly less bargaining power than D.R. Horton.

choice in agreeing to arbitrate (citing *Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 554, 606 S.E.2d 752, 757 (2004); S.C. Code Ann. § 36-2-302(1) (1976))).

Second, D.R. Horton asserted that the court of appeals' decision violated the United States Supreme Court's holding in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.  See* 388 U.S. 395, 406 (1967) (holding that courts may only consider the threshold question of whether the *arbitration agreement* is fraudulently induced and thus invalid, not whether the *contract as a whole* is invalid); *see also S.C. Pub. Serv. Auth. v. Great W. Coal (Ky.), Inc.*, 312 S.C. 559, 562–63, 437 S.E.2d 22, 24 (1993) (adopting a broad interpretation of *Prima Paint* in South Carolina, and holding that "a party cannot avoid arbitration through rescission of the entire contract when there is no independent challenge to the arbitration clause" (the *Prima Paint* doctrine)).  In D.R. Horton's view, the arbitration agreement was contained exclusively in subparagraph 14(g), and therefore, the court of appeals' consideration of the allegedly one-sided terms in subparagraph 14(i) was inappropriate.[3]

Ultimately, the court of appeals denied the petition for rehearing, and we granted D.R. Horton's petition for a writ of certiorari to review the court of appeals' decision.

## ISSUE

Whether the arbitration agreement is unconscionable?

## STANDARD OF REVIEW

Arbitrability determinations are subject to de novo review.  *Bradley v. Brentwood Homes, Inc.*, 398 S.C. 447, 453, 730 S.E.2d 312, 315 (2012).  However, a circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports the findings.  *Id.* at 453, 730 S.E.2d at 315.

## ANALYSIS

---

[3] In conjunction with this argument, D.R. Horton also asserted that a severability analysis was inappropriate because the portions of the Agreement that the court of appeals considered severing were not actually part of the arbitration agreement, i.e., were not part of subparagraph 14(g).

### I.    *The* **Prima Paint** *Doctrine*

As an initial matter, we address D.R. Horton's argument regarding the court of appeals' alleged failure to heed the *Prima Paint* doctrine.[4]

In *Prima Paint*, the Supreme Court held that to avoid arbitration, a party must assert a contractual defense to the arbitration agreement itself, and not to the contract as a whole.  *See* 388 U.S. at 406.  Thus, for example, a party must allege that the *arbitration agreement* is unconscionable, not that the *entire contract* is unconscionable.  *See S.C. Pub. Serv. Auth.*, 312 S.C. at 562–63, 437 S.E.2d at 24. Similarly, in conducting an unconscionability inquiry, courts may only consider the provisions of the arbitration agreement itself, and not those of the whole contract.

Here, the parties fundamentally disagree on the application of the *Prima Paint* doctrine to the Agreement.  D.R. Horton asserts that the arbitration agreement is wholly contained in subparagraph 14(g).  Therefore, according to D.R. Horton, the Court may not consider any of the remaining subparagraphs of paragraph 14—such as subparagraph 14(i)'s damages limitation—in determining whether the arbitration agreement is unconscionable.  We disagree.

Like the lower courts, we construe the entirety of paragraph 14, entitled "Warranties and Dispute Resolution," as the arbitration agreement.  As the title indicates, all the subparagraphs of paragraph 14 must be read as a whole to understand the scope of the warranties and how different disputes are to be handled.  The subparagraphs within paragraph 14 contain numerous cross-references to one another, intertwining the subparagraphs so as to constitute a single provision.

Thus, in accordance with the *Prima Paint* doctrine, we find that in determining whether the arbitration agreement is unconscionable, we may properly consider the entirety of paragraph 14.

### II.    *Unconscionability*

---

[4] As will be explained further, *infra*, we must address this issue first because it controls which portions of the Agreement we may properly consider in conducting our unconscionability analysis.

"In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Simpson*, 373 S.C. at 24–25, 644 S.E.2d at 668 (citations omitted).[5]

Whether one party lacks a meaningful choice in entering the arbitration agreement at issue typically speaks to the fundamental fairness of the bargaining process. *Gladden v. Boykin*, 402 S.C. 140, 148, 739 S.E.2d 882, 886 (2013) (quoting *Simpson*, 373 S.C. at 25, 644 S.E.2d at 669). Thus, parties frequently allege they lacked a meaningful choice when the dispute involves an adhesion contract. *See Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 541, 542 S.E.2d 360, 365 (2001) (defining adhesion contracts as "standard form contract[s] offered on a take-it or leave-it basis with terms that are not negotiable"). While adhesion contracts are not unconscionable per se, courts tend to look upon them with "considerable skepticism" because they give rise to "considerable doubt that any true agreement ever existed to submit disputes to arbitration." *Id.* at 26–27, 644 S.E.2d at 669–70 (quotation marks omitted). In determining whether a party lacked a meaningful choice to arbitrate, courts should consider, *inter alia*, the relative disparity in the parties' bargaining power, the parties' relative sophistication, whether the parties were represented by independent counsel, and whether "'the plaintiff is a substantial business concern.'" *Id.* (quoting *Simpson*, 373 S.C. at 25, 644 S.E.2d at 669).

"We have [] taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller." *Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 343, 384 S.E.2d 730, 735–36 (1989); *cf. Sapp v. Ford Motor Co.*, 386 S.C. 143, 147–48, 687 S.E.2d 47, 49–50 (2009) (stating that South Carolina's "courts have shifted from following the doctrine of *caveat emptor* ('let the buyer beware') to the doctrine of *caveat venditor* ('let the seller beware')"). There is no indication in the record that the Smiths enjoyed a substantially stronger bargaining position against D.R. Horton than the average homebuyer, or that they were represented by independent counsel. Moreover, the Smiths were a single client to a corporation that constructs houses in

---

[5] We note that the court of appeals addressed only the allegedly oppressive nature of the terms found in the arbitration agreement, but appears not to have considered whether the Smiths lacked a meaningful choice in agreeing to arbitrate. We caution courts and parties in the future to analyze both prongs of unconscionability.

twenty-seven states. Thus, the Smiths were also not a substantial business concern of D.R. Horton, as they did not comprise a large portion of D.R. Horton's clientele.

Accordingly, we find that the Smiths lacked a meaningful choice in their ability to negotiate the arbitration clause in the Agreement.

Moreover, in considering the actual provisions of the arbitration agreement, we find that D.R. Horton's attempts to disclaim implied warranty claims and prohibit *any* monetary damages are clearly one-sided and oppressive. Under the terms of paragraph 14, the only remedy provided for a defect in the home is repair or replacement—options left entirely in the discretion of D.R. Horton. This is no remedy at all because it leaves the relief to the whim of D.R. Horton while simultaneously allowing no monetary recuperation when, as here, the repairs are simply inadequate. We therefore affirm the court of appeals and hold the arbitration provision is unconscionable and thus unenforceable.[6]

---

[6] Because the arbitration agreement does not contain a severability clause, we find the parties did not intend for the Court to strike unconscionable provisions from the arbitration agreement. Thus, we decline to analyze whether the unconscionable provisions are severable, as doing so would be the result of the Court rewriting the parties' contract rather than enforcing their stated intentions. *See Simpson*, 373 S.C. at 34, 644 S.E.2d at 673.

## CONCLUSION

For the foregoing reasons, the decision of the court of appeals is

**AFFIRMED.**

**BEATTY and HEARN, JJ., concur.  KITTREDGE, J., dissenting in a separate opinion in which PLEICONES, C.J. concurs.**

**JUSTICE KITTREDGE:**  The underlying contract involves interstate commerce and, as a result, the Federal Arbitration Act (FAA) controls.  Because I believe the majority has not followed controlling precedent of the United States Supreme Court, I respectfully dissent.  In my judgment, state law does not provide a valid basis to avoid enforcing this particular agreement to arbitrate, and the court of appeals erred in upholding the circuit court's refusal to compel arbitration.  I would reverse.

## I.

This arbitration agreement is subject to the FAA, a fact conspicuously absent in the majority opinion.  "'Generally, any arbitration agreement affecting interstate commerce is subject to the FAA.'" *Cape Romain Contractors, Inc. v. Wando E., LLC*, 405 S.C. 115, 121–22, 747 S.E.2d 461, 464 (2013) (quoting *Landers v. Federal Deposit Ins. Co.,* 402 S.C. 100, 108, 739 S.E.2d 209, 213 (2013)).  "The United States Supreme Court 'has previously described the [FAA]'s reach expansively as coinciding with that of the Commerce Clause.'"  *Id.* at 122, 747 S.E.2d at 464 (quoting *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 274 (1995)).  "Thus, in determining whether the FAA applies to a particular arbitration agreement, a court considers whether the contract concerns a transaction involving interstate commerce."  *Id.* (citing *Episcopal Housing Corp. v. Fed. Ins. Co.,* 269 S.C. 631, 637, 239 S.E.2d 647, 650 (1977)).

In support of its motion to compel arbitration, D.R. Horton submitted affidavits from several executives indicating that D.R. Horton is a Delaware corporation with its principal place of business in Texas.  These affidavits further establish D.R. Horton is engaged in the residential construction business in twenty-seven states and that many of the building materials and supplies used in constructing the Smiths' home in Summerville were obtained from suppliers outside South Carolina.[7]  Because the arbitration clause at issue here is included in a contract that evidences a transaction involving interstate commerce, the FAA governs the enforceability of the arbitration provision.  *See Cape Romain*, 405 S.C. at 123–24, 747 S.E.2d at 465 (citing *Zabinski v. Bright Acres Assocs.,* 346 S.C. 580, 594–95, 553 S.E.2d 110, 117–18 (2001); *Episcopal Housing,* 269 S.C. at 640, 239 S.E.2d 647 S.E.3d at 652) (observing that out-of-state materials used in construction were

---

[7] These materials include rebar, framing materials, wall sheathing, windows, gypsum drywall, shingles, cabinets, carpet, vinyl flooring, plumbing fixtures, lighting hardware, and appliances.

instrumentalities of interstate commerce); *see also Zabinski*, 346 S.C. at 594, 553 S.E.2d at 117 (relying upon affidavits in determining whether a transaction involves interstate commerce).

## II.

The FAA requires that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The United States Supreme Court has construed section 2 of the FAA as permitting "agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011). However, this provision of the FAA has been narrowly construed.

Moreover, "[a] recurring question under § 2 [of the FAA] is who should decide whether grounds exist at law or in equity to invalidate an arbitration agreement." *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (internal quotations omitted). The United States Supreme Court has determined that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1697)). Indeed, absent a "discreet challenge to the validity of the arbitration clause," federal law establishes that challenges to the validity of contractual provisions "are within the arbitrator's ken." *Preston*, 552 U.S. at 353–54.

"[W]hen parties commit to arbitrate contractual disputes, it is a mainstay of the [FAA]'s substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first instance . . . ." *Nitro-Lift Techs., LLC, v. Howard*, 133 S.Ct. 500, 503 (2012) (internal quotation marks omitted) (citing *Preston*, 552 U.S. at 349; *Prima Paint*, 388 U.S. at 403–04). The permissible scope of the initial judicial inquiry is "highly circumscribed" and must relate "specifically to the arbitration clause." *Hooters of America, Inc. v. Phillips,* 173 F.3d 933, 938 (4th Cir. 1999). If the arbitration provision is found to be valid (or is not challenged), then the validity of the remainder of the contract is for the arbitrator to decide. *Nitro-Lift*, 133 S.Ct. at 503. Moreover, "this arbitration law applies in state as well as federal courts." *Buckeye*, 546 U.S. at 446. Simply put, courts—state or federal—may decide only the question of whether the parties validly agreed to

arbitrate the dispute that has arisen; controversies as to the enforceability of any other contractual provision(s)—including those which may be so objectionable as to undermine the contract in its entirety—are to be resolved by the arbitrator.

Here, the majority acknowledges this point of law, as it must. However, the majority nevertheless adopts the findings of the trial court, which circumvent the application of these legal principles by expanding the relevant scope of the contractual language at issue to include matters beyond the arbitration provision. This is accomplished by the fiction that the arbitration provision is the entirety of Paragraph 14, which contains more than 1,800 words. Indeed, the following is the portion of the parties' contract the majority finds to constitute the "arbitration provision":

## 14. WARRANTIES AND DISPUTE RESOLUTION

**a. Structural Warranty.** At Closing, Seller shall execute and deliver to Purchaser at no additional cost a warranty from Residential Warranty Corporation ("RWC") or such other national warranty provider as Seller may reasonably elect (the "RWC Warranty"). This RWC Warranty will provide, at a minimum, a ten (10) year structural warranty. *The RWC Warranty referred to in this paragraph is the only warranty being made by Seller, except for such warranties which may not be disclaimed by State or Federal law.* In addition, Seller hereby assigns to Purchaser all warranties, expressed or implied, which arise or are given by the manufacturer of any product installed in the home built on the Property.

**b. RWC Warranty.** Purchaser has been, or will be prior to Closing, provided with a copy of the RWC Warranty book on the Ten Year Limited Warranty, which is administered by the Residential Warranty Corporation. Validation of the RWC Warranty is conditioned upon the Seller's compliance with all RWC's enrollment procedures and upon Seller remaining in good standing in the RWC Program.

**c. *The RWC Warranty is provided by Seller to Purchaser in lieu of all other warranties, verbal agreements, or representations and Seller makes no warranty, express or implied, as to quality, fitness for a particular purpose, merchantability, habitability or otherwise, except as is expressly set forth in the Program or as otherwise required by Federal or State law.* Particularly, Purchaser understands and**

**agrees that any and all complaints of any nature in regard to the property that arise more than 365 days after closing must be submitted to RWC.**  Purchaser understands and agrees that the warranties of all appliances and other consumer products installed in the home are those of the manufacturer or supplier and same are assigned to Purchaser, effective on the date of Closing.  In any event, Seller shall not be liable for any personal injury or other consequential or secondary damages and/or losses, which may arise from or out of any and all defects.  **Except for purchasers of FHA or VA financed homes, Purchaser acknowledges and understands that the RWC Warranty includes a provision requiring all disputes that arise under the RWC Warranty to be submitted to binding arbitration.**  Purchaser has been, or will be given prior to Closing, provided with a copy of the D.R. Horton Warranty manual, "Foundations."  Purchaser understands and agrees to all warranties to their extent as outlined in said manual.  Purchaser shall execute an acknowledgement that Seller makes no warranties express or implied, as to fitness for a particular purpose, merchantability, and habitability as set forth above at Closing, which statement shall be affixed to Purchaser's deed.

Purchaser Initial(s):  <u>s/GS</u>            <u>s/SM</u>

**d. Exclusions.**  The following are excluded from all warranties provided by Seller: (i) those matters excluded in the RWC Warranty documents; (ii) those matters excluded in sub-paragraph (f) below, and (iii) the following matters:

Landscaping, including trees, shrubs, grass and flowers are not covered by any warranty.  All grading, fill, landscaping, disposition of trees and control of water flow shall be constructed and maintained at the sole discretion of Seller prior to Closing.  Grading and drainage are not covered by any warranty nor will they be maintained or modified by Seller after closing in any way whatsoever UNLESS the grading or drainage is found to be in violation of the applicable provision of the South Carolina Residential Construction Standards.  Many areas will be left in their natural state and will not be landscaped in any way.  As of the date and time of Closing, Seller shall have no further responsibility for soil erosion, the growth of grass, death of trees, grass or shrubbery, or soil conditions.  Seller is

not liable for trees or shrubs, or damage or destruction to same. Seller makes no warranty whatsoever as to the type, location or amount of trees, which will exist on the property after construction. Seller will plant grass seeds or install sod, as the case may be, as part of its construction. Because the growth of grass seeds and the health of sod is dependent on Purchaser's care and maintenance, no warranty is provided and all grass is installed "as-is." Because prevention of erosion is dependent on Purchaser's proper maintenance of the grass and sod, Seller provides no warranty for erosion. Purchaser's closing of the sale constitutes an acceptance of Seller's drainage and erosion controls for the Property, except for matters noted on Purchaser's "Punch list." Seller shall not be responsible for the correction of any leakage or seepage caused by (i) damaged water pipes or mains, (ii) alteration of the landscaping by a party other than Seller (specifically including, without limitation, any changes which cause water to flow toward the dwelling), or (iii) prolonged direction of water against the outside foundation wall from a spigot, sprinkler, hose, or improperly maintained gutters or down spouts. Seller will not warrant any cosmetic defect post-closing unless this condition is listed on the "punch list" prior to Closing. Examples of "cosmetic defects" include sheetrock dings, dimples and nail pops, paint discoloration, chips or irregularities in marble, Formica, or tile. Unless a defect is noted on the "punch list," Seller does not warrant the installation or the quality of any carpet or flooring product (however, note that Seller assigns the manufacturer warranties to Purchaser at Closing).

Purchaser Initial(s):  s/GS          s/SM

**e. Existing Trees:** D.R. Horton will make every effort to save as many existing trees as possible during the construction process. Those trees that must be removed will be removed at the sole discretion of the Area Manager and their Field Manager. D.R. Horton reserves the right to remove any trees, which in their judgment may have roots damaged by construction to the extent that the tree would not be expected to live. Those trees that are in or within close vicinity of the home's footprint or concrete flatwork area will be removed. Additionally, trees that impede the drainage of the site, or overall community drainage plan will be removed. D.R. Horton does not guarantee the health, survival or growth of any tree after closing. Repairs to living trees and removal or

replacement of dead trees at any time after closing is the responsibility of the buyer unless requested before closing, agreed upon, and <u>noted in writing</u> at the "Pre-settlement Orientation Inspection."

Purchaser Initial(s):  <u>s/GS</u>          <u>s/SM</u>

**f. Landscaping**.  D.R. Horton does not guarantee the continued health, growth or life of any landscape components after closing.  Survival of landscaping components (trees, bushes, plants, sod, seed etc.) after closing is the buyer's responsibility.  No landscaping items will be replaced or repaired after closing unless noted in writing and agreed upon at the "Pre-settlement Orientation Inspection."  Landscaping requires a continuous maintenance program, which includes proper watering, fertilization, mowing and weed control.  Deficiencies, other than those noted prior to closing, will not be warranted by D.R. Horton.  Upon closing, all maintenance is the responsibility of the buyer.  The buyer is responsible for any damage due to neglect or inadequate maintenance.  Wetland, wetland buffers and wooded natural areas throughout the Community will be left "as is."  Buyer understands that "standing water" beyond 40'-0" of the home may occur in wetland, wetland buffers and wooded natural areas.  Maintenance and repair of the aforementioned areas are the sole responsibility of the Buyer after closing.  Clearing and disturbance of natural areas in order to provide underground utility services to the home may be necessary.  These areas will be left un-landscaped and allowed to return to their natural state.  The remaining undisturbed area will be left in its natural state.

Purchaser Initial(s):  <u>s/GS</u>          <u>s/SM</u>

**g. MANDATORY BINDING ARBITRATION.**  Purchaser and Seller each agree that, to the maximum extent allowed by law, they desire to arbitrate all disputes between themselves.  The list of disputes which shall be arbitrated in accordance with this paragraph include, but are not limited to: (1) any claim arising out of Seller's construction of the home; (2) Seller's performance under any Punch List or Inspection Agreement; (3) Seller's performance under any warranty contained in this Agreement or otherwise; and (4) any other matters as to which Purchaser and Seller agree to arbitrate.

**i.** If the arbitration arises out of a claim arising under the RWC Warranty, the rules, terms and conditions in the RWC Warranty certificate and related materials delivered to Purchaser shall control.

**ii.** If the arbitration arises out of any claim other than a claim under the RWC Warranty, then the arbitration shall be conducted in Charleston/Dorchester/Berkeley County, South Carolina. The arbitrations shall be conducted by an arbitrator or panel of arbitrators agreed upon by the parties, and to the extent possible, the proceeding shall be conducted under rules, which provide for an expedited hearing. The filing fee for such arbitration shall be paid by the party filing the arbitration demand, but the arbitrator shall have the right to assess or allocate the filing fees and any other costs of the arbitration as part of the arbitrator's final order. The arbitration referred to in this paragraph shall be binding and any party shall have the right to seek judicial enforcement of the arbitration award.

Purchaser Initial(s):  <u>s/GS</u>          <u>s/SM</u>

**h.** In addition to the rights and obligations of each party specified in subparagraphs (a)–(d) above, in the event that a bona fide dispute, as determined by the Seller, should arise between Purchaser and Seller prior to the Closing Date, and such dispute cannot in good faith be resolved completely and to the mutual satisfaction of all parties within ten (10) days after the beginning of the dispute, then Seller shall have the right, upon written notice to Purchaser, to terminate this Agreement and return the Earnest Money to Purchaser, and <u>no cause of action shall accrue on behalf of Purchaser because of such termination</u>.

**i. Limitation of liability.  EXCEPT FOR THE RWC WARRANTY, AND EXCEPT FOR THE TITLE WARRANTIES SPECIFIED IN PARAGRAPH 4 ABOVE, AND EXCEPT FOR ANY WARRANTIES IMPOSED BY LAW, WHICH CANNOT BE DISCLAIMED, *SELLER MAKES NO OTHER WARRANTY OF ANY KIND, ALL SUCH OTHER WARRANTIES ARE HEREBY DISCLAIMED BY SELLER.  SELLER MAKES NO WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EITHER EXPRESSED OR IMPLIED.  THE EXCLUSIVE REMEDY FOR ANY DEFECT OF ANY ITEM OR***

**CLAIMED DEFECT IN THE HOME IS BY WRITTEN NOTIFICATION PRIOR TO THE EXPIRATION OF THE WARRANTY PERIOD. SELLER'S OBLIGATION SHALL BE THE CORRECTION OF SUCH DEFECT BY REPAIR OR REPLACEMENT, IN ITS DISCRETION. NO SUCH ACTIONS TAKEN BY SELLER TO REPAIR OR REPLACE A DEFECT SHALL EXTEND THE WARRANTY PERIOD.** *SELLER SHALL NOT BE LIABLE FOR MONETARY DAMAGES OF ANY KIND, INCLUDING SECONDARY, CONSEQUENTIAL, PUNITIVE, GENERAL, SPECIAL OR INDIRECT DAMAGES.*

**j.** Requests for warranty service within the first 365 days after closing, must be in writing and faxed, mailed, or delivered to Seller at Seller's address as indicated below Seller's signature on this Agreement. Verbal requests to Seller's staff are not acceptable. Such requests must comply with all applicable law and must state the nature of the problem with particularity. Seller has 30 days to determine whether such request will be fulfilled.

(italicization added).

In seeking to avoid arbitration on the basis of unconscionability, the Smiths claimed the italicized language in the above excerpt represents D.R. Horton's attempt to disclaim certain implied warranties and to eliminate liability for monetary damages, the terms of which are unfairly oppressive and one-sided. However, in opposing arbitration, the Smiths do not challenge any provision of subparagraph (g) titled "MANDATORY BINDING ARBITRATION." More to the point, the Smiths do not contend the specific agreement to arbitrate was unconscionable.

As noted, federal law requires that unless the claim of unconscionability goes to the arbitration clause itself, the issue of enforceability must be resolved by the arbitrator, not by the courts. Thus, courts can consider unconscionability challenges only when they relate to the issue of whether the parties agreed to arbitrate disputes in the first place. *See Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) ("Principles of equity may counsel for invalidation of an arbitration agreement if the grounds for revocation relate specifically to the arbitration clause. . . . However, when claims allege unconscionability of the contract generally, these issues are determined by an

arbitrator because the dispute pertains to the formation of the entire contract, rather than the arbitration agreement." (citing *Hooters of America*, 173 F.3d at 938; *Coleman v. Prudential Bache Sec., Inc.,* 802 F.2d 1350, 1352 (11th Cir. 1986))).

Here, the majority circumvents controlling federal law by construing the entirety of paragraph fourteen—i.e. all ten separately denominated subparagraphs—as comprising the arbitration agreement. In attempting to justify such a construction, the majority cites no supporting authority, instead reasoning that the contract groups warranties and dispute resolution together under a single heading "Warranties and Dispute Resolution" and that "[t]he subparagraphs within paragraph 14 contain numerous cross-references to one another, intertwining the paragraphs so as to constitute a single provision." Indeed, it is only by treating paragraph fourteen as a single, indivisible provision that the majority is able to transform the Smiths' objection to certain warranty and liability disclaimers into a challenge to the arbitration provision, only the latter being proper for judicial rather than arbitral determination.

I reject the majority's construction that the arbitration provision is the entirety of paragraph fourteen. In my judgment, under well-established state law, paragraph fourteen is comprised of numerous severable provisions, which include not only the parties' mutual promise to settle any disputes through arbitration, but also various other distinct provisions, including D.R. Horton's promise to provide a ten-year structural warranty, D.R. Horton's promise to assign appliance manufacturer warranties to the Smiths, mutual promises regarding which party is responsible for landscaping maintenance at various points in time, and the Smiths' promise to give written notice of any warranty claims in accordance with specified procedures, among many other things.

Specifically, I believe the challenged warranty disclaimers and liability limitations are separate and distinct from the agreement to arbitrate, in terms of both formatting and subject matter. Indeed, not only does the parties' chosen paragraph structure and subparagraph denomination spatially delineate these provisions as separate from the agreement to arbitrate, but also the gravamen of each of these terms is distinct and independently operative. Consequently, as a matter of South Carolina law, these provisions are properly viewed as discrete terms rather than as a cohesive contractual provision. *See Columbia Architectural Grp., Inc. v. Barker*, 274 S.C. 639, 641, 266 S.E.2d 428, 429 (1980) (explaining that a "severable contract is one in its nature and purpose susceptible of division and apportionment, having two or more parts, in respect to matters and things contemplated and

embraced by it, not necessarily dependent upon each other, nor is it intended by the parties that they shall be," and finding a lump-sum contract for services involved severable provisions despite interdependence of material terms); *Packard & Field v. Byrd*, 73 S.C. 1, 51 S.E. 678, 680 (1905) (finding contract terms relating to the seller's promise to deliver shoes and the buyer's promise to purchase shoes were distinct and severable, and therefore enforceable, despite the presence of other contractual provisions which were deemed unenforceable as against public policy); *Beach Co. v. Twillman, Ltd.*, 351 S.C. 56, 65, 566 S.E.2d 863, 867 (Ct. App. 2002) (finding a single subparagraph was comprised of three discrete provisions because "separate and distinct rights" were implicated in each provision).

Further, I emphasize the fact that the Smiths separately initialed subparagraph (g) titled "MANDATORY BINDING ARBITRATION" (and four other subparagraphs within paragraph fourteen), which in my judgment indicates the parties themselves viewed these terms as distinct contractual provisions to which they separately consented. *See Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003) (noting "[t]he cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions" (citation omitted)); *Columbia Architectural Group.*, 274 S.C. at 641, 266 S.E.2d at 429 ("The entirety or severability of a contract depends primarily upon the intent of the parties rather than upon the divisibility of the subject, although the latter aids in determining the intention." (quoting *Packard & Field*, 73 S.C. at 6, 51 S.E. at 679)); *Jaffe v. Gibbons*, 290 S.C. 468, 473, 351 S.E.2d 343, 346 (Ct. App. 1986) (finding a party's act of initialing two paragraphs amounted to a signing and an acceptance of a counter offer relating to those two provisions). Thus, it is my view that the majority's decision to ignore the obvious divisibility of the multitude of contractual terms within paragraph fourteen contravenes state law.

Moreover, "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Buckeye Check Cashing*, 546 U.S. at 445; *see also* 6 C.J.S. Arbitration § 11 ("Agreements for arbitration contained in a contract are treated as separable parts of the contract, so that the illegality of another part of the contract does not nullify an agreement to arbitrate." (citing *Robert Lawrence Co. v. Devonshire Fabrics. Inc.*, 271 F.2d 402 (2d Cir. 1959))). The United States Supreme Court has identified an arbitration provision as consisting of the "specific written provision to settle by arbitration a controversy." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010) (internal quotation marks omitted). Stated differently, as a function of federal law, the relevant arbitration provision consists of only that portion of subparagraph (g)

in which the parties agree to arbitrate any controversies. Accordingly, even if state law justified the majority's finding that the entirety of paragraph fourteen constitutes the relevant arbitration provision (which it does not), such a finding would in any event be in conflict with, and therefore preempted by, federal substantive law identifying only a portion of subparagraph (g) as the arbitration agreement. *See Concepcion*, 563 U.S. at 352 (finding state law rules that conflict with or "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of [the FAA]" are preempted and invalidated); *see also DirecTV, Inc. v. Imburgia*, 136 S.Ct. 463, 468–69 (2015) (citing U.S. Const. art. VI, cl. 2) (reaffirming the holding in *Concepcion* that state contract principles which conflict with the FAA are preempted).

Because the Smiths fail to raise *any* challenge to the arbitration provision in subparagraph (g), I would find the Smiths' claims regarding unconscionability must be resolved in an arbitral forum, and I would reverse the court of appeals' decision. *Cf. Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 542, 542 S.E.2d 360, 365 (2001) ("An agreement providing for arbitration does not determine the *remedy* for a breach of contract but only the *forum* in which the remedy for the breach is determined.").

**PLEICONES, C.J., concurs.**